THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALBERT REYNOLDS, Defendant-Appellant.

First District (3rd Division)    No. 1—91—0368

Opinion filed January 12, 1994.

Michael J. Pelletier and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Robyn Berman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Following a jury trial, defendant, Albert Reynolds, was convicted of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1)) for the death of his mother, Lealer Reynolds. He was sentenced to 35 years' imprisonment. On appeal, defendant asserts that (1) the trial court erred in denying his motion to quash arrest and suppress evidence based on the lack of probable cause to arrest and his being unlawfully detained for 55 hours until he made an incriminating statement; and (2) he was not proven guilty beyond a reasonable doubt. We quash defendant's arrest, suppress his confession, reverse his conviction, and remand for a new trial and such further proceedings as the trial court shall determine.

At the pretrial hearing on defendant's motion to quash arrest and suppress his statement, Chicago police detectives Jerome Rusnak and Victor Breska both testified that they arrived at the victim's home around 6 p.m. on June 4, 1989. They found her lying on her stomach in the bathroom. A small pool of blood was under her head and her body was cold. It appeared that the victim had died from a fall, striking her head and bleeding to death. There were no signs of trauma to the body, of forced entry, or of a struggle.

Defendant told the detectives that he found the front door closed but unlocked when he arrived for supper at 4:30 p.m. He said that he went in and found his mother lying on the bathroom floor. When he felt the body, it was cold, so he asked neighbors to call the police. According to the detectives, defendant appeared to have been drinking and was extremely nervous, agitated, and upset. As the detectives were leaving, defendant asked them several times whether there were any signs of foul play.

Rusnak and Breska interviewed the victim's neighbors, who stated that defendant had been in the neighborhood that afternoon telling people that his mother's apartment door was open.

Chicago police detectives William Foley and William Kelley both testified that they learned at 12:30 p.m. on June 5, 1989, that the autopsy indicated the victim's death was a homicide. The detectives went to the victim's home, processed the scene, and interviewed neighbors and family members. The bathroom floor was bloodstained and the walls were splattered with blood. There were no signs of forced entry.

Foley and Kelley interviewed Dorothy Reynolds Easton, the victim's daughter. Easton told the police that cash, a wallet, and food from the freezer were missing. According to Easton, her mother was very security conscious and always kept her doors locked. Easton also told the detectives that defendant did not have a key and was not allowed into her mother's home when he had been drinking.

Later that afternoon, Foley and Kelley went to defendant's apartment. After telling defendant that his mother's death was a homicide, they asked him to go to the station to help with the investigation. Defendant agreed. According to the detectives, defendant was calm, but had been drinking. He was not searched, handcuffed, or advised of his *Miranda* rights.

After arriving at the Area Three police station around 4:30 p.m. on June 5, 1989, the detectives put defendant in an interview room which had lockers, a table, and several chairs. When they noticed red spots on his pants and shoes, defendant told them that the spots were paint, not blood, but agreed to have his clothes tested. After defendant gave them his pants and shoes, the detectives gave him a paper suit to wear. Both detectives denied ever hitting defendant, forcing him to take off his pants, accusing him of killing his mother, threatening him, or handcuffing him.

Chicago police sergeant Owens testified that he was on duty from 3 to 11:30 p.m. on June 5, 1989. He stated that defendant was intoxicated when he came to the station so he was put into an unlocked interview room to sober up. Owens checked on defendant, who never asked to leave, was not handcuffed to a ring on the wall, and slept much of the time.

Chicago police detective Louis Ceasar testified that he spoke with defendant around 5 p.m. on June 5, 1989, in an unlocked interview room. He did not advise defendant of his *Miranda* rights because he was not a suspect. Defendant, who was intoxicated and smelled of alcohol, but appeared to be calm, was not handcuffed. He signed a consent form to search his apartment for items stolen from his

mother's home because he wanted to find out what had happened to his mother.

Ceasar left the station and interviewed the victim's neighbors. According to Ceasar, various discrepancies occurred between the statements of defendant and the neighbors. At 11:30 p.m., Ceasar again spoke with defendant, who was more alert, sober, and very cooperative. Ceasar asked defendant if he were willing to stay at the police station overnight and take a polygraph examination the next day. Defendant agreed.

On June 6, 1989, defendant took a polygraph examination. At 4:30 p.m., Ceasar advised him of his *Miranda* rights and told him that he had failed the polygraph examination. During the ensuing conversation, defendant told Ceasar that William Rutledge, who was a friend, may have had access to the victim's home. Ceasar left the station to interview Rutledge.

Sergeant Owens testified that defendant's daughter, Renita Reynolds, arrived about 8 p.m. on June 6, 1989. When she arrived, defendant was taken by Owens to a different room, which had air conditioning. After visiting privately with her father, Ms. Reynolds left and returned with food for her father. Before leaving the station, Ms. Reynolds told Owens that she would appreciate her father staying at the police station until the next day. According to Owens, he told Ms. Reynolds that the police would try to keep defendant at the station, but that he would miss his mother's funeral if the police came up with any evidence with which to charge him.

Detective McKinley testified that on June 7, 1989, he and three other detectives took defendant to his residence at 3 a.m. They searched his premises. Thereafter, they all drove to defendant's mother's house, where McKinley remained in the car with defendant while the other detectives went into the house for an hour. Upon returning to the police station, they took defendant back into the interview room. At 6:30 p.m. on June 7, 1989, Detectives Rusnak and Breska spoke with defendant, who was calm and relaxed. After Breska advised defendant of his *Miranda* rights, a conversation occurred until 8 p.m., when defendant's son, Dr. Reynolds, arrived with cigarettes and money for food. Defendant visited privately with his son for 30 minutes upstairs in a room. After the visit, Dr. Reynolds told Breska that the family wanted defendant to stay at the police station until defendant's mother's funeral.

At 9 p.m., the detectives again told defendant that he had failed the polygraph examination and that there were several discrepancies between his statements and those of several neighbors. Defendant responded that he suffered from alcohol blackouts and that his mem-

ory was returning. He asked for some time to think about what had happened. Defendant was left alone in the unlocked interview room.

At 11 p.m., defendant informed Breska that he wanted to tell him what really happened the day his mother died. After Breska advised him of his *Miranda* rights, defendant made an oral confession. Breska formally placed defendant under arrest, locked the door to the interview room, and notified the State's Attorney's office.

Assistant State's Attorney Michelle Katz spoke with defendant at 12:30 a.m. on June 8, 1989. Katz testified that defendant was calm, articulate, had a friendly demeanor, and was fully in control of his faculties. After being advised of his *Miranda* rights, defendant repeated his confession to Katz. He read the written statement aloud and signed it.

The trial court denied the motion, stating that defendant's claims of deception, brutality, and coercion were totally inconsistent with the evidence. The trial court concluded that the statement was voluntary and not the product of an illegal arrest.

At trial, Detective Ceasar testified regarding defendant's oral statements. On June 5, 1989, at 5 p.m., defendant told Ceasar that he had been on a drinking binge for about a week before he went to his mother's house on the afternoon of June 4, 1989. Defendant stated that his mother's door was open, so he went around the back to tell Ruth Cathledge, a neighbor. Ms. Cathledge gave defendant a ride home, where he slept for about 40 minutes before returning to his mother's house. Defendant then went inside and discovered his mother's body.

When Ceasar told defendant that some of his mother's property was missing, defendant agreed to sign a consent to search form and stated that he wanted to find out what had happened to his mother. None of the missing items were found in defendant's apartment.

The next day around 4:30 p.m., defendant told Ceasar that he could not remember what had happened because of periodic blackouts caused by his drinking. Defendant repeated his earlier account except that he said it was 3 p.m. when he found his mother's body.

After defendant told Ceasar that Rutledge had access to his mother's house and may have killed her, the police spoke with Rutledge and searched his residence, but did not find any evidence. The remainder of Ceasar's testimony was substantially the same as his testimony during the pretrial hearing.

Several of the victim's neighbors testified that they saw defendant in the neighborhood on the afternoon of June 4, 1989. Alpha Lee Wright, the victim's next-door neighbor, testified that the last time she saw the victim alive was on June 2, 1989. About 1 p.m. on

June 4, 1989, Ms. Wright saw defendant, who was drunk, coming from his mother's house. He approached Ms. Wright and told her that his mother was dead, but she did not take him seriously.

Defendant then walked to Tamika Beals' house, where he yelled from outside the gate, "[C]ould I use the phone, my mother's dead." When no one came to the door, he went across the street to Rosetta Howard's house.

Ms. Howard testified that defendant came to her house around 1 p.m. on June 4, 1989. He asked her to come to his mother's house because she had left her door open and was gone. After Ms. Howard did nothing, defendant left. He later returned and asked Ms. Howard to come to his mother's home because her door was open. Ms. Howard told defendant that he was drunk and she was not going to his mother's house. Again, defendant left. When he returned around 3:30 p.m., he told Ms. Howard that his mother was dead. The last time Ms. Howard saw the victim alive was between noon and 1 p.m. on June 3, 1989.

Ms. Cathledge testified that she saw defendant at 4:15 p.m. on June 4, 1989. He asked her to come to his mother's house because her door was open, which was unusual. Defendant told Ms. Cathledge that he had not been in the house, but then admitted that he had gone into the house and saw that her purse had no money in it. Ms. Cathledge went into the victim's house while defendant waited outside. When there was no response to her calls, she left. Defendant told her not to close or lock the door.

Dr. Yuskel Konakci, who conducted the autopsy on June 5, 1989, testified that there were multiple stab wounds to the heart, liver, stomach, right hip, left side of the back, abdomen, left ear, left eye, and right ear. In addition, there were abrasions on the left side of the chest, abdomen, inner left arm, right side of her back, and right hip. In Dr. Konakci's expert opinion, the cause of death was multiple stab and incised wounds. Dr. Konakci determined that death occurred at least 24 hours before the body was brought to the morgue, which was at 8:45 p.m. on June 4, 1989.

Chicago police detective George Vallandigham testified that he spoke with defendant for 45 minutes on June 6, 1989, at 11 p.m. Detective Breska testified regarding defendant's statement made to him at 11 p.m. on June 7, 1989. According to Breska, defendant stated that he went to his mother's house around noon on June 4, 1989, after drinking with a friend. He rang the doorbell and his mother let him in. When she began scolding him for drinking, defendant became upset and hurt because he wanted to have a nice visit with his mother.

Defendant told Breska that he went to the kitchen and took a knife from the drawer. His mother stood in the kitchen doorway and continued to scold him. When defendant turned and faced his mother with the knife, she backed up toward the bathroom. Defendant followed her. As his mother reached the bathroom doorway, defendant told her that he did not like her fussing at him and stabbed her once in the front part of her body. His mother began fighting and he stabbed her at least five more times. When she fell to the floor, he stabbed her several more times.

Defendant also told Breska that he took meat from his mother's freezer, a red metal box, a wallet, and house keys. Then, he left and went to 55th and Normal Streets, where he sat on the parkway while drinking wine. After he finished the wine, defendant left the items he took from his mother's home, bought more wine, and went home to drink it.

According to defendant, he returned to his mother's house to see how badly she was hurt. When he found her dead, he left and went home. Later, he returned to tell one of his mother's neighbors to call the police.

Assistant State's Attorney Katz testified regarding defendant's written statement, which was essentially the same as his oral statement to Breska.

Defendant's case consisted solely of the expert testimony of Dr. Bernard Greenberg, who is a consultant in the field of forensic entomology and has been studying maggots for 40 years. Based on his experience and a photograph of a maggot taken from the victim's body, Dr. Greenberg opined that the time of death was 1 p.m. on June 2, 1989.

Following closing arguments, the jury found defendant guilty of first degree murder. After the trial court considered both mitigating and aggravating factors, it sentenced defendant to 35 years' imprisonment.

On appeal, defendant asserts that the trial court erred in denying his motion to quash arrest and suppress evidence because he was arrested at his residence or shortly thereafter without probable cause and unlawfully detained for 55 hours until he made a confession.

Defendant contends that he was subjected to the functional equivalent of an arrest on the basis that (1) the police wanted to question him at the police station instead of at his home; (2) the police did not tell him that he was free to refuse to go to the station or that he was free to leave once he was at the station; (3) he was picked up by the police and not given the option of going to the station on his own; (4) he was taken to an interview room instead of being told to wait in

the public waiting area; (5) he was asked to submit his pants and shoes for testing even though he told the police that the red spots were paint from his sign shop; (6) he was forced to wear a paper jumpsuit and no shoes for six hours; (7) the police left him alone in an interview room while they did paperwork; (8) he was questioned by another detective who requested that he sign a consent form to search his residence for items stolen from his mother; (9) he did not have freedom of movement around the station; (10) he was asked to take a polygraph test; (11) he stayed overnight at the station without proper sleeping facilities while waiting to take the polygraph examination; (12) he was in the police station for 55 hours before making an inculpatory statement; and (13) the police indicated to defendant's daughter that they intended to keep defendant at the police station.

In response, the State asserts that defendant was not unlawfully detained and maintains that defendant was arrested only after he made his oral confession to Breska.

In determining whether an arrest has occurred, the court makes an objective determination whether a reasonable person, innocent of any crime, would have considered himself or herself arrested or free to leave. (*Michigan v. Chesternut* (1988), 486 U.S. 567, 573, 100 L. Ed. 2d 565, 572, 108 S. Ct. 1975, 1979; *People v. Holveck* (1990), 141 Ill. 2d 84, 95, 565 N.E.2d 919.) The factors to consider include the time, place, length, mood, and mode of the interrogation; the number of police officers present; any indicia of formal arrest or evidence of restraint; the intention of the officers; the extent of the officers' knowledge; the focus of the officers' investigation (*People v. Brown* (1990), 136 Ill. 2d 116, 124-25, 554 N.E.2d 216); the subjective belief of the detainee concerning his arrest status (*People v. Booker* (1991), 209 Ill. App. 3d 384, 393, 568 N.E.2d 211); any statement or nonverbal conduct by the police indicating that the detainee was not free to leave (*People v. Langlo* (1987), 153 Ill. App. 3d 636, 641-42, 505 N.E.2d 1338); and whether the detainee was told that he was free to leave or that he was under arrest. *Holveck*, 141 Ill. 2d at 95.

It has been held that a person is seized within the meaning of the fourth amendment when, by a show of authority or use of physical force, his freedom of movement is restrained. (*United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870.) A seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." *Terry v. Ohio* (1968), 392 U.S. 1, 16, 20 L. Ed. 2d 889, 903, 88 S. Ct. 1868, 1877.

In the *Holveck* case, the police stopped the defendant's automobile because a similar vehicle was seen acting suspiciously regarding an investigation. When the defendant asked for his driver's license back,

he was told to go to the police station to pick it up. When he arrived at the police station, he was surrounded by police cars and was then escorted to an interrogation room. He was kept under observation in the interrogation room. The defendant testified that he felt he was not free to leave. The court held that under the totality of the circumstances, a reasonable person, innocent of a crime, would have considered himself under arrest.

No one factor is dispositive. A determination will vary with all of the circumstances surrounding the detention in each case. Even if a defendant was not told that he was under arrest, not touched by a police officer, not handcuffed, fingerprinted, searched, or subjected to any other arrest procedures, he may have been illegally detained if he was not told that he could leave and he did not feel free to leave. (*Holveck*, 141 Ill. 2d at 92.) In addition, a defendant may be significantly deprived of his freedom once investigators focus on him instead of others and repeatedly confront him with discrepancies. *People v. Fox* (1982), 111 Ill. App. 3d 243, 247, 443 N.E.2d 1179.

In *Florida v. Royer* (1983), 460 U.S. 491, 493-94, 75 L. Ed. 2d 229, 233-34, 103 S. Ct. 1319, 1321-22, the police stopped the defendant in the Miami Airport because he fit their drug courier profile. After questioning him, the police took him to a room where he allowed them to search his luggage, which contained drugs.

The Court determined that the defendant was illegally detained because the consensual inquiry in a public place escalated into an investigatory procedure in a police interrogation room where the police attempted to confirm their suspicions about the defendant's illegal activity. (*Royer*, 460 U.S. at 503, 75 L. Ed. 2d at 240, 103 S. Ct. at 1327.) Since probable cause to arrest did not exist at the time the defendant consented to the search of his luggage, the consent was tainted by the illegal arrest and the evidence was suppressed. *Royer*, 460 U.S. at 507-08, 75 L. Ed. 2d at 243, 103 S. Ct. at 1329.

In *People v. Young* (1990), 206 Ill. App. 3d 789, 800-01, 564 N.E.2d 1254, which is factually similar to this case, the court stated that the most important factors in determining the illegal detention were that the defendant (1) was not asked to wait in the public waiting room at the police station; (2) was put in an interrogation room with the door closed; (3) was not released or told he was free to leave after he was questioned by a police officer even though he had not implicated himself; (4) spent the night in a room with no sleeping facilities; (5) was denied telephone calls; (6) was in the police station 12 hours before making an incriminating statement; and (7) was briefly questioned only once after the initial interview.

Even though the defendant had initiated the contact with the po-

lice and agreed to go to the station, those acts were not dispositive of voluntary acts because the police officer originated the idea of going to the station. (*Young*, 206 Ill. App. 3d at 801.) Furthermore, the defendant's agreement to go to the station did not legitimize his treatment after he arrived at the station. If he was merely being questioned as a witness, he would not have been ignored and left to spend the entire night in a small, windowless room, lacking in basic facilities, with the door closed. The court rejected the argument that the defendant voluntarily chose to spend the lengthy time period in the interrogation room at the police station. *Young*, 206 Ill. App. 3d at 801.

■ In this case, considering only the testimony of the police officers and taking that testimony as true, we conclude that defendant's detention constituted an illegal seizure. While a seizure did not occur when the police took defendant from his home or when he first arrived at the police station, it occurred well before he made any incriminating statement. Even though the information the police had was enough for them to suspect defendant, "the detention to which he was then subjected was a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity." *Royer*, 460 U.S. at 502, 75 L. Ed. 2d at 239, 103 S. Ct. at 1326-27.

When defendant arrived at the police station around 4:30 p.m. on June 5, 1989, he was not being detained. He voluntarily went to the police station to help with the investigation. He was not handcuffed, searched, or advised of his *Miranda* rights. When he was placed in an interrogation room, the detectives noticed red spots on defendant's pants and shoes. Although defendant stated that it was paint, the detectives asked whether the pants and shoes could be tested. Defendant agreed. After giving the detectives his pants and shoes, defendant was given a paper suit to wear until he was given another pair of pants later that night.

A short time later, Detective Ceasar spoke with defendant but did not advise him of his *Miranda* rights because he was not a suspect. That belief, however, was not communicated to defendant. Defendant signed a consent form to search his residence for items stolen from his mother's house.

Although defendant was not handcuffed and the interview room door was closed, but not locked, it can be concluded that defendant was being detained. At that time, a reasonable person, innocent of any crime, would have considered himself arrested. (*Chesternut*, 486 U.S. at 573, 100 L. Ed. 2d at 572, 108 S. Ct. at 1979; *Holveck*, 141 Ill. 2d at 95.) By 11:30 p.m. when Ceasar asked defendant to stay

overnight and take a polygraph examination the next day, there is no doubt that defendant had been arrested.

Next, we must determine whether probable cause to arrest existed at the time of defendant's arrest on June 5, 1989. If not, the arrest was illegal.

Probable cause to arrest exists when facts and circumstances within the arresting officer's knowledge are sufficient to warrant a person of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense. (*People v. Creach* (1980), 79 Ill. 2d 96, 101, 402 N.E.2d 228; *People v. Lopez* (1992), 228 Ill. App. 3d 1061, 1078, 593 N.E.2d 647.) Probable cause to arrest is not established merely because a person lies or is confused about when he arrived at the crime scene or discovered the body (*People v. Lucy* (1990), 204 Ill. App. 3d 1019, 562 N.E.2d 1158) or was last seen with the victim before the victim's death. *People v. Dace* (1987), 153 Ill. App. 3d 891, 899, 506 N.E.2d 332.

The State relies on *People v. McClellan* (1992), 232 Ill. App. 3d 990, 1002, 600 N.E.2d 407, where the court concluded that there was sufficient evidence to establish probable cause. Before taking the defendant to the police station, the police knew that the victim had been stabbed, there were no signs of forced entry, and the offender sometimes stayed in the same building as the victim and had a key to the victim's apartment. They also knew that the defendant was staying in an apartment in the victim's building at the time of her murder. *McClellan*, 232 Ill. App. 3d at 994-95.

Furthermore, there were significant discrepancies between the defendant's statements and those of other neighbors. (*McClellan*, 232 Ill. App. 3d at 994.) The defendant told the police that he returned to the Banks' apartment, where he was staying, at 1 a.m. and went to sleep. When he awoke at 7 a.m., he learned of the victim's murder. Michael Banks, however, told the police that the defendant returned to his apartment around 4 a.m. and gave him $50 to buy cocaine. Banks left. When he returned, the defendant had a fresh bandage on his hand and a reddish-brown stain on one of his shoes. Another neighbor told the police that the defendant was in her apartment drinking until 3:30 a.m. When she refused to lend him $10 to buy cocaine, he left. *McClellan*, 232 Ill. App. 3d at 995.

*McClellan* is factually dissimilar to this case. When the police took defendant Reynolds to the police station at 4:30 p.m. on June 5, 1989, they knew that the victim had died of multiple stab wounds; there were no signs of forced entry or a struggle; there was blood on the bathroom floor and blood splattered on the walls; items missing were frozen food, keys, a wallet, and cash; defendant was not allowed

in his mother's home when he had been drinking and did not have keys to her home; defendant was in his mother's neighborhood on the afternoon that her body was discovered; defendant was drunk that afternoon; defendant discovered his mother's body and contacted the police; and defendant lived near his mother in a room attached to a sign shop.

At that time, defendant was not being detained and the police did not think there was probable cause to arrest him. Detective Ceasar testified that he did not advise defendant of his *Miranda* rights at 5 p.m. on June 5, 1989, because defendant was a witness, not a suspect. During that interview, defendant told Ceasar that he had been with Cynthia Harrison the day before he discovered his mother's body.

Between 4:30 p.m. and 5:30 p.m., defendant gave the police his pants and shoes and signed a consent to search form. Nothing was found during the search and there is no evidence that the clothes were ever tested for bloodstains.

At 11:30 p.m., Ceasar returned from interviewing the victim's neighbors. Because of apparent discrepancies between their statements and those made by defendant, Ceasar asked defendant to stay overnight at the station and take a polygraph examination the next day.

The discrepancies that existed regarding the time that defendant arrived at his mother's home were that (1) Ms. Cathledge said that defendant told her at 4:30 p.m. that his mother's door was open and that there was no money in her purse; (2) Ms. Beals told the police that defendant came to her house at 3:30 p.m. and said his mother was dead; (3) Ms. Howard stated that defendant came out of his mother's house at 1 p.m. and told her that the door was open; and (4) Ms. Wright said that defendant told her at 1 or 1:30 p.m. that his mother was dead.

Defendant had told the police that he arrived at his mother's home at 4:30 p.m. and found his mother dead. He had also told the police that he was on a drinking binge when he arrived at his mother's home on the afternoon of June 4, 1989. When he found his mother's door open, he went to Ms. Cathledge's house to tell her. She gave him a ride home. After sleeping for about 40 minutes, defendant returned to his mother's home, went inside, and discovered his mother's body.

At that time, there still was no probable cause to arrest. No physical evidence against defendant had been discovered and the apparent discrepancies were insignificant. Defendant had been drinking and appeared drunk when the police arrived at the crime scene at 6 p.m.

The neighbors placed defendant in the neighborhood between 1 and 1:30 p.m. and between 3:30 and 4 p.m. Defendant told the police that he found his mother's body at 4:30 p.m. and had been in the neighborhood earlier that afternoon.

By this time, defendant was being illegally detained without probable cause. Yet, probable cause did not arise the next day either. At 4:30 p.m. on June 6, 1989, Ceasar advised defendant of his *Miranda* rights and told him that he had failed the polygraph examination. Defendant repeated his earlier statements, except that he told Ceasar that he had arrived at his mother's home at 3 p.m. on June 4, 1989. In addition, defendant indicated that William Rutledge, who was a friend, may have had access to the victim's home.

The police spoke to Harrison and Rutledge after defendant supplied them with their names. Cynthia Harrison told the police that she saw defendant, who was intoxicated, with a knife on June 3, 1989. William Rutledge said that he saw defendant on June 3, 1989. Defendant was intoxicated and said that he needed money. None of that information can be considered to establish probable cause to arrest defendant because it was obtained by exploiting the illegal arrest. *People v. Franklin* (1987), 115 Ill. 2d 328, 334, 504 N.E.2d 80.

It was defendant who gave the police the names of Harrison and Rutledge after he had already been illegally arrested. Officer Ceasar testified that after defendant signed the consent form to search his apartment, he left to interview the victim's neighbors. During the questioning, defendant had supplied Ceasar with the name of Cynthia Harrison. The next day defendant gave Officer Ceasar the name of Rutledge.

Sometime after 9 p.m. on June 6, 1989, Sergeant Owens spoke with defendant's daughter. Owens indicated that the police did not think they had probable cause to arrest defendant when he told Ms. Reynolds that defendant would miss his mother's funeral if the police came up with any evidence with which to charge him.

During the early morning hours of June 7, 1989, the detectives again questioned defendant. At 3 a.m., he was taken to his residence for a second search, but no evidence was found. While the police went to his mother's house to speak to defendant's brother, defendant stayed in the squad car with one of the officers. There still was no probable cause to arrest. The evidence gathered by the police would not warrant a person of reasonable caution in believing that defendant had killed his mother. *Creach*, 79 Ill. 2d at 101.

At 9 p.m. on June 7, 1989, the detectives again told defendant that he had failed the polygraph examination and that there were several discrepancies in his statements. Again, this occurred long af-

ter the illegal arrest and seizure. Defendant asked for time alone to think. He was left alone until 11 p.m. when he confessed to Detective Breska. Finally, the police had probable cause to arrest defendant.

After considering the totality of the circumstances, we conclude that the police did not have probable cause to arrest defendant until he made a confession at 11 p.m. on June 7, 1989. Since defendant was illegally arrested long before there was probable cause to arrest, the trial court erred in denying defendant's motion to quash arrest. Therefore, we quash defendant's arrest.

The determination that an illegal arrest has occurred, however, is not dispositive of the issue of the admissibility of defendant's subsequent confession. Statements given during an illegal detention are inadmissible if they are the product of an illegal detention and not the result of an independent act of free will. (*Royer*, 460 U.S. at 501, 75 L. Ed. 2d at 238, 103 S. Ct. at 1326.) Evidence obtained as a result of the illegal detention must be suppressed absent significant intervening circumstances that purged the taint of the illegal arrest. *Dunaway v. New York* (1979), 442 U.S. 200, 219, 60 L. Ed. 2d 824, 840, 99 S. Ct. 2248, 2260.

To determine whether the confession was obtained by exploiting the illegality, the court must focus on the causal connection between the illegality and the confession. (*Dunaway*, 442 U.S. at 217, 60 L. Ed. 2d at 839, 99 S. Ct. at 2259.) Factors to consider are the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. (*Brown v. Illinois* (1975), 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62.) Voluntariness of the confession is not an issue. *Royer*, 460 U.S. at 501, 75 L. Ed. 2d at 238, 103 S. Ct. at 1326.

While confronting a defendant with incriminating statements by others can be an independent intervening event, it purges the taint of the illegal arrest only if it is not itself a product of the illegal arrest. (*People v. Stofer* (1989), 180 Ill. App. 3d 158, 170, 534 N.E.2d 1287.) Thus, the statements by Harrison and Rutledge cannot be considered as independent intervening events because defendant furnished their names to the police while he was being illegally detained. In addition, any discrepancies between the statements made by the neighbors and those made by defendant were not significant.

■ We conclude that the State has failed to sustain its burden of showing that the confession was admissible. (*Brown*, 422 U.S. at 604, 45 L. Ed. 2d at 427-28, 95 S. Ct. at 2262.) During the time between the arrest and the confession, there was no significant intervening event that purged the taint. (*Brown*, 422 U.S. at 604, 45 L. Ed. 2d at 428, 95 S. Ct. at 2262.) Furthermore, the impropriety of the arrest

was obviously investigatory and undertaken "in the hope that something might turn up." (*Brown*, 422 U.S. at 605, 45 L. Ed. 2d at 428, 95 S. Ct. at 2262; *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103.)

> "When there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts." *(Dunaway,* 442 U.S. at 218, 60 L. Ed. 2d at 839, 99 S. Ct. at 2259.)

Therefore, defendant's confession should have been suppressed as the fruit of his illegal arrest.

■ We next address whether there was sufficient evidence admitted at trial for the jury to conclude that defendant was guilty beyond a reasonable doubt. We conclude that the evidence presented at trial was sufficient for a jury to decide that defendant was guilty beyond a reasonable doubt. This does not mean that we are making a finding as to defendant's guilt or innocence which will be binding in a new trial, but rather our consideration of the evidence admitted at trial will protect defendant's constitutional right against double jeopardy. See *People v. Taylor* (1979), 76 Ill. 2d 289, 309-10, 391 N.E.2d 366, 375; *People v. Hammock* (1984), 121 Ill. App. 3d 874, 882-83, 460 N.E.2d 378-85.

Accordingly, the trial court's order denying defendant's motion to quash arrest and suppress evidence is reversed, the arrest is quashed, and the evidence is suppressed. Defendant's conviction is also reversed and the case is remanded for a new trial and such further proceedings as the trial court shall determine.

Reversed and remanded.

TULLY, P.J., and RIZZI, J., concur.