# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Marcella*, 2013 IL App (2d) 120585

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. WILLIAM B. MARCELLA, Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-12-0585 |
| Filed | September 10, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court properly granted defendant's motion to suppress the 300 pounds of cannabis discovered in his small plane following a flight from Arizona, notwithstanding the information obtained by Homeland Security Customs and Border Protection agents about defendant's history of narcotics activity, the details of his flight, and his alleged consent to a search of his plane, since he was arrested without probable cause shortly after landing, his illegal seizure and his subsequent alleged consent were so inextricably connected that any consent was not purged of the taint of the illegal seizure, and that taint was not attenuated by any intervening circumstances. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 09-CF-216; the Hon. George J. Bakalis, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal — Robert B. Berlin, State's Attorney, of Wheaton (Lisa A. Hoffman, Assistant State's Attorney, and Lawrence M. Bauer and Scott Jacobson, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

No brief filed for appellee.

Panel — JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. Justices McLaren and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1        On January 25, 2009, the defendant, William B. Marcella, was charged by felony complaint with unlawful cannabis trafficking (720 ILCS 550/5.1(a) (West 2008)). Law enforcement officers had discovered over 300 pounds of cannabis in 8 cardboard boxes on a small airplane owned and operated by the defendant. On January 22, 2010, the defendant filed a motion to suppress the evidence, arguing that the officers had neither reasonable suspicion nor probable cause to detain him. The trial court granted the defendant's motion to suppress. The State appeals. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3        On January 13, 2011, a hearing was held on the defendant's motion to suppress. At the hearing, the following evidence was presented. Robert Grice testified that he was a line service technician at Du Page Airport. On January 24, 2009, between 4:30 and 5 p.m., he was in an office with Ryan Gohl and one other person. A plane had just landed. They overheard radio communications about clearing the airspace and saw a Blackhawk helicopter coming toward the airport from the east. They jumped in a truck and headed toward the helicopter, which was in the vicinity of the "E1" hangar. When they reached the hangar, there were 10 unmarked cars and the helicopter landed hard and fast. Agents jumped out wearing tactical jumpsuits. One air agent had his gun drawn and pointed toward two men who had their hands up against the overhead door of the hangar. About 10 ground agents also had their guns drawn and pointed at the 2 men by the hangar. The overhead door of the hangar was closed.

¶ 4        Gohl testified that he was a line service technician at Du Page Airport. On January 24, 2009, he was in an office that had a radio linked to the control tower frequency. The tower had shut down the airspace and declared an emergency landing for a small airplane. The tower directed the plane to the E1 hangar. He and the others in the office headed to the hangar and saw a Blackhawk helicopter land next to it. The landing was very fast and

aggressive. About six agents jumped out of the helicopter and rushed the hangar. One agent had an assault rifle drawn and was scanning the area. There were two men up against the hangar, being frisked. There were 15 to 20 other agents there and 6 to 10 cars. There were multiple agents with weapons drawn and pointed at the two men. After the two men were frisked, they were handcuffed and brought toward the parked cars. Agents were patrolling and going in and out of the hangar through a side door. The plane was already in the hangar and the overhead hangar door was closed.

¶ 5      The defendant testified that he had held a pilot's license for 40 years. At 9 a.m. on January 24, 2009, he left the Marana, Arizona, airport on his way to Du Page Airport. He had no passengers. Earlier, at 7:30 a.m., he had applied for a weather briefing, which was a weather report sanctioned by the Federal Aviation Administration (FAA). Applying for the weather report made the FAA aware of his name, tail number, license number, address, and phone number. When he took off, he had his transponder on, which meant that any aircraft radars would know his license number and tail number. He initially was flying under "visual flight rules" (VFR)–in other words, without a flight plan. About 30 to 40 minutes into the flight, he filed a flight plan with the Albuquerque control center. After he landed at Du Page, he taxied to hangar E1, which he leased. He was met by Walter Klein, who helped him push his plane into the hangar. They exited the hangar and pushed the remote control button to close the overhead hangar door.

¶ 6      While standing in front of the hangar, he saw a Blackhawk helicopter. It came in with a hard and fast landing. Four to five agents rushed out of it in "full battle regalia." One had a nightscope and rifle and the others had guns. The agents rushed toward him and Klein. He and Klein both put their hands up in the air. They were put up against the hangar door, frisked, and cuffed with their hands behind their backs. They were taken to the fence next to the hangar while agents walked in and out of the hangar through a side door. The defendant was eventually brought into the hangar and told to stand in front of the plane's right wing. His cuffs were removed. There were 6 to 11 agents in the hangar at any given time.

¶ 7      One of the agents asked him his name. He gave the agent his name. The agent then asked for his pilot's license and medical certificate. When the defendant reached for his wallet, the agent grabbed his jacket by the back of the collar and pushed him down. The agent took the defendant's wallet out of the defendant's pocket and allowed the defendant to take the documents out of his wallet. The defendant was handcuffed again. The agent then asked for the defendant's airworthiness certificate and airplane registration. The defendant told the agent that the airworthiness certificate was in the back of the airplane, above the hat rack. The defendant testified that, at that point, there were already agents in the cockpit rummaging around. The agent asked if he could retrieve the airworthiness certificate, but the defendant said no. The agent then proceeded to the airplane with other agents and unlocked the cargo door with a key, which the defendant had left in the ignition. The agents started removing boxes from the plane. The defendant testified that he did not give the officers permission to enter the plane. The agent noted that the defendant's medical certificate did not allow him to fly commercial cargo and asked the defendant what was in the boxes. The defendant did not answer. The defendant testified that about two hours after the helicopter landed, he saw a dog enter the hangar.

¶ 8    On cross-examination, the defendant testified that he had loaded the boxes onto his plane the night before. He had made stickers that said "Garmin" and put them on the boxes. He had been flying out of the Marana airport for about three years. He did not fly directly from Marana to Du Page, because there were mountain ranges, military zones, and desolate areas he wanted to avoid. The route he flew–east and then north–was the safest route. He followed I-10 into New Mexico and I-25 to Albuquerque. A direct flight path from Marana to Albuquerque is nothing but wilderness. He did not file a flight plan for about 30 to 40 minutes after he took off because he needed to reach an elevation of about 12,000 feet, above the local mountain ranges, for the radio to work well enough to contact the Albuquerque control center at the Tucson airport. Finally, the defendant testified that if he had been trying to avoid detection he would not have put the transponder on, asked for a weather briefing, or filed a flight plan with Albuquerque control center. The defendant acknowledged that, by filing a flight plan after he was in New Mexico, no one would know his point of origination.

¶ 9    Rachel Huff testified that she was employed by the Department of Homeland Security (DHS) Customs and Border Protection and Air Marine Operations Center (AMOC). As of the date of her testimony, she had worked there for about three years. Prior to that she was an air traffic controller for the United States Navy for five years. Her responsibilities at AMOC included detecting, sorting, and tracking aircraft.

¶ 10    On January 24, 2009, at 7:15 a.m. Pacific Standard Time, she detected an aircraft near Marana with a "1200" transponder code, which meant that it was flying under VFR. The aircraft proceeded east over 100 miles and then the transponder code changed to 1644, which meant that the pilot was communicating with air traffic control. She called the Albuquerque control center and verified that the tail number was N433S. She went through various databases and saw that the aircraft was linked to the defendant and that the defendant had a history with narcotics. He had drug-related arrests in 1967 (possession of marijuana), 1975 (possession of dangerous drugs), and 1984 (distribution of marijuana). Although he had no convictions of these offenses, he had a 1985 conviction of income tax evasion. Huff then contacted the FAA and asked about recent activity on the aircraft. She verified the weather briefing, the tail number, and the pilot's identity as the defendant. Other database checks showed that the defendant once had a passenger by the name of William Schwartz and that Schwartz had been convicted of possession of 1,000 kilograms of cocaine.

¶ 11    Huff testified that she relayed her findings to her supervisor, who directed her to call the duty officer at Immigration Customs Enforcement (ICE) in Chicago. The duty officer contacted Agent Steve Fekete, who then called Huff. Huff told Fekete about what she saw, the defendant's history, and the possibility that Schwartz could be on board. Huff testified that, in her experience, an aircraft flies directly from point A to point B. Based on the defendant's flight pattern, air traffic control would not have known his origination point.

¶ 12    On cross-examination, Huff acknowledged that she was not a pilot and not familiar with the Marana airport. When she first detected the defendant's plane, the transponder was on, which made the plane visible to radar. She acknowledged that there was no requirement for pilots flying under VFR to turn on their transponders. Although she had looked at topography maps, she did not recall if she saw the Catalina or Grand Mountains northeast of the Marana airport. She acknowledged that there were a lot of mountains in the area and that the area

around I-10 was much flatter and more populated. She did not know how long it would take to get over a 10,000-foot mountain range that was less than 20 miles from the airport. Nonetheless, she had never seen this type of flight pattern. Huff acknowledged that the defendant did not try to use a fictitious tail number or name, did not attempt to turn off his transponder, and was flying within a range detectable by radar.

¶ 13    Steve Shockney testified that he had been employed by Homeland Security Customs and Border Protection for 12 years. Before that, he had been an Army pilot/warrant officer. On January 24, 2009, he was flying from Washington, D.C., following the presidential inauguration, to Michigan in a UH-60 Blackhawk helicopter when he received a call from his supervisor asking him to divert to Du Page Airport. There were two others in the helicopter with him. They arrived at Du Page at 5:15 p.m. After landing, he and another agent exited the helicopter and went to hangar E1, which was open. He was in a tan flight suit with a shoulder harness for his pistol. The other agent had fatigues, a bulletproof vest, and an M-4 rifle. On the way to the hangar, they met up with ICE Agents Fekete and Hartnett. They called to the defendant and Klein to come out from the hangar area. The defendant and Klein were pushing the airplane into the hangar. Shockney testified that his weapon was out of the holster, but he was holding it down at his side. The defendant was handcuffed by the ICE agents, until they could figure out if the area was safe. After the safety check, the cuffs were removed.

¶ 14    Shockney asked the defendant for his pilot's license, medical certificate, and airworthiness certificate. The defendant produced the first two, but not the third. Shockney testified that the defendant gave him permission to enter the plane to retrieve the airworthiness certificate and the operator's manual. Shockney could not reach the airworthiness certificate because there were too many boxes in the plane. The defendant, who was not handcuffed or held at gunpoint, gave Shockney permission to remove the boxes. Shockney removed only enough boxes to reach the airworthiness certificate. The operator's manual was on the dash of the plane. The manual was full of copies of paper that said "Garmin." Shockney testified that the defendant's license did not permit him to fly commercial cargo. Shockney asked the defendant if he was flying for hire or if the boxes belonged to him. At that point, the defendant became uncooperative and refused to answer any more questions. Shockney waited for a canine unit to arrive.

¶ 15    On cross-examination, Shockney testified that he had been told that the defendant's plane was "suspect for drugs." He was told the type of plane, the defendant's name, and the flight plan. He did not have communication with any other agents until after he landed. He did not have his weapon out when he landed. He did not remove it until he was closer to the hangar and he then kept it down at his side. After the defendant was handcuffed, Shockney entered the hangar only to do the safety check. The defendant was handcuffed only for a matter of minutes. Shockney testified that the defendant was not free to leave during the document check or before the canine unit arrived. Other agents witnessed the defendant give Shockney permission to enter the plane to retrieve the airworthiness certificate. It took the canine unit less than two hours to arrive at the airport.

¶ 16    Ron Hain testified that he was a deputy with the Kane County sheriff's department. He had special training as a canine handler. On January 24, 2009, he worked in a special

operations unit whose primary function was narcotics enforcement. On that date, he and his drug-detection dog, Mato, conducted a search on an airplane at Du Page Airport. He had been contacted at 4:30 p.m. about a potential drug sniff. At 5:23 p.m. he was told to go to the airport. When he arrived at the airport, at 6:05 p.m., he was directed inside the E1 hangar and asked to check the exterior of the airplane for a narcotic odor. Mato indicated that there were narcotics in some boxes on the floor and at the cargo door. The boxes on the floor were not opened.

¶ 17        Fekete testified that he had been employed by the DHS, Investigations, for four years. Prior to that, he had been a Village of Roselle police officer for six years. On January 24, 2009, at 3:30 p.m., Huff called him to advise him of a "suspicious aircraft." She said that the plane had left Marana and that there were several indicators that raised suspicion, including the flight pattern and the pilot's and the plane's previous involvement with narcotics trafficking. According to Fekete, Huff said that the Marana airport was known for drug trafficking and that the plane had taken off without a flight plan. Fekete immediately drove to Du Page Airport and started calling other agents. He called Agent Hartnett, who started a phone tree. Fekete arrived at the airport at 4:35 p.m. At 5:02 p.m., an agent from AMOC called and said that the plane had touched down. Airport employees directed Fekete to hangar E1. At 5:10 p.m., he saw the defendant pushing his plane into the hangar. At 5:15 p.m., a Blackhawk helicopter landed. He, another agent, and two air officers approached the hangar. He was armed, but his gun was at his side. It was not pointed at the defendant.

¶ 18        The air officers approached the defendant while Fekete approached Klein. The database had indicated that Klein was an associate of the defendant. The air officers handcuffed the defendant. There was a minivan with Texas plates parked outside the hangar. All the seats were down as if ready to transport something. Klein told Fekete that he was driving it and that it was a rental. After the officers determined that the plane, hangar, and van were clear, they separated the defendant and Klein. The cuffs were removed from the defendant and Klein. Shockney conducted the document check on the defendant. Boxes removed from the plane were marked "Garmin." Based on his experience, Fekete believed that the boxes contained drugs. The defendant and Klein never asked to leave. The hangar door was open until the defendant asked that it be closed because it was so cold outside. At 5:25 p.m., an agent asked the defendant to sign a consent to search the boxes, but the defendant refused. The agents called for a canine unit, which arrived at 6:15 p.m. After the drug sniff turned out positive, they proceeded to obtain a search warrant. They obtained a search warrant at 2:30 a.m. the next morning.

¶ 19        On May 3, 2012, the trial court issued a written opinion, granting the defendant's motion to suppress. The trial court found that the case boiled down to whether the agents had a reasonable suspicion of criminal activity to justify a *Terry* stop and, if so, whether the agents exceeded the scope of a *Terry* stop by arresting the defendant. The trial court made the following factual findings. Other than flying 100 miles due east at takeoff, the defendant flew a direct route to Du Page Airport. The defendant was identifiable and trackable at all times by air traffic controllers. The defendant had past drug-related arrests, but none in recent years. At some unknown time in the past, Schwartz had been a passenger in the defendant's airplane and had been convicted of cocaine trafficking. The only information Shockney had

at the time the defendant was arrested was that the defendant was suspected of drug activity. The trial court found Shockney's testimony to be "evasive and less than credible" and found that the "testimony of the civilian witnesses was the true manner in which this detention occurred." The trial court also found not credible Fekete's testimony that Huff told him that the Marana airport was known for drug trafficking. The trial court noted that Huff never indicated that she conveyed such information to Fekete and had testified that she had no personal knowledge of the Marana airport.

¶ 20 The trial court determined that the defendant's actions and his dated criminal history presented no more than a hunch that the defendant was engaged in criminal activity. The trial court stated that "[t]he police conduct here would subject any person flying a plane who had a criminal history at any time in the past to be subject to a *Terry* type detention." Accordingly, a *Terry* stop was not justified. The trial court further found that the defendant was seized in a manner indicative of arrest. The defendant was surrounded by 8 to 10 armed agents with weapons drawn and pointed at the defendant. The defendant did not try to flee and made no movements indicating that he was reaching for a weapon. The trial court found that safety was not a basis for handcuffing the defendant. The trial court noted that no reasonable person would have felt free to leave and that Shockney had testified that the defendant was not free to leave. The trial court further found that there was no probable cause to believe that the defendant had committed or was about to commit a crime at the time of the arrest. Finally, the trial court held that any evidence discovered after the search warrant was obtained should also be excluded because the information used to obtain the warrant was the result of the illegal detention and arrest of the defendant. Thereafter, the State filed a certificate of impairment and a timely notice of appeal.

¶ 21          II. ANALYSIS

¶ 22 On appeal, the State argues that the trial court erred in granting the defendant's motion to suppress. The State first contends that the defendant was lawfully detained and arrested. Alternatively, the State argues that the agents had a reasonable articulable suspicion to justify detaining the defendant and that their investigation over the course of the next hour, while waiting for the canine unit, did not exceed the lawful bounds of a *Terry* stop. Finally, the State argues that the defendant voluntarily consented to a search of his airplane to retrieve the airworthiness certificate.

¶ 23 At the outset, we note that the defendant did not file an appellee's brief. Nevertheless, we may address the merits of the appeal because the record is simple and the claimed error can be easily decided without the aid of an appellee's brief. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976).

¶ 24 Review of a ruling on a motion to suppress evidence can present a question of law, questions of fact, or both. *People v. Lee*, 214 Ill. 2d 476, 483 (2005). A reviewing court must give great deference to the trial court's findings of fact and should reverse them only if they are against the manifest weight of the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). However, a reviewing court will review *de novo* the ultimate question of whether a motion to suppress should be granted. *People v. Luedemann*, 222 Ill. 2d 530, 542-43 (2006).

¶ 25    The fourth amendment to the United States Constitution protects "the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' " *People v. Pitman*, 211 Ill. 2d 502, 513 (2004) (quoting U.S. Const., amend. IV). "Similarly, article I, section 6, of the Illinois Constitution provides that the 'people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches [and] seizures.' " *Id.* (quoting Ill. Const. 1970, art. I, § 6). Our supreme court has interpreted the search-and-seizure clause of the Illinois Constitution in a manner consistent with the United States Supreme Court's fourth-amendment jurisprudence. *Id.*

¶ 26    The fourth amendment and the Illinois Constitution prohibit searches and seizures only where they are unreasonable. A warrantless arrest requires probable cause. *People v. Love*, 199 Ill. 2d 269, 278 (2002). However, under *Terry v. Ohio*, 392 U.S. 1 (1968), if a police officer "has 'knowledge of sufficient articulable facts at the time of the encounter to create a reasonable suspicion that the person in question has committed, or is about to commit, a crime' [citation] the officer may briefly stop and detain the person to make reasonable inquiries." *Love*, 199 Ill. 2d at 275 (quoting *People v. Smithers*, 83 Ill. 2d 430, 434 (1980)). The *Terry* analysis asks: (1) whether the officer's action was justified at its inception; and (2) whether the action was reasonably related in scope to the circumstances that justified the interference in the first place. *People v. Cosby*, 231 Ill. 2d 262, 275 (2008).

¶ 27    In the present case, the State does not argue that the defendant was not seized. The State argues only that the seizure was reasonable as it was supported by both reasonable suspicion and probable cause. The State argues that reasonable suspicion and probable cause were established by the defendant's erratic flight path, the in-air filing of a flight plan thereby concealing the defendant's point of origin, Huff's alleged statement that the Marana airport was known for drug trafficking, Marana's close proximity to the Mexican border, and the defendant's drug-related criminal history.

¶ 28    Probable cause exists "when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *People v. Grant*, 2013 IL 112734, ¶ 11. The existence of probable cause is governed by "commonsense considerations, and the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt." *Id.* The police must have more than a mere suspicion that a crime has been committed, but do not need evidence sufficient to convict. *People v. Jones*, 374 Ill. App. 3d 566, 575 (2007) (citing *People v. Lippert*, 89 Ill. 2d 171, 178 (1982)). The existence of probable cause depends on the totality of the circumstances at the time of the arrest. *People v. Wear*, 229 Ill. 2d 545, 564 (2008).

¶ 29    The factors cited by the State do not establish probable cause. Although the defendant did not follow a direct flight path and was able to conceal his point of origin by commencing his flight under VFR, the defendant did nothing to avoid radar detection. As noted by the trial court, the defendant was at all times identifiable and trackable by air traffic controllers. See *United States v. Broome*, No. 1:05-CR-135-WSD, 2006 WL 508054, at *2 (N.D. Ga. Feb. 28, 2006) (noting that drug smugglers typically misidentify their aircraft while in flight to hide their movements, conceal their identity, and avoid detection). Further, the trial court found incredible Fekete's testimony that Huff had stated that the Marana airport was known

for drug trafficking. The trial court is in the best position to evaluate the credibility of the witnesses and resolve conflicts in their testimony (*People v. Jones*, 215 Ill. 2d 261, 268 (2005)) and we therefore defer to the trial court's credibility findings. Additionally, the agents had no independent basis, such as an informant's tip or a pattern of drug smuggling from Marana to Du Page, to believe that a crime had been committed. We agree with the trial court that the defendant's dated criminal history, flight path, and proximity to the Mexican border were not sufficient to establish probable cause. See *United States v. Dickerson*, 873 F.2d 1181, 1184 (9th Cir. 1988) (erratic flight pattern and abrupt return to Mexico, although indicative of "less than innocent activity," were insufficient to establish probable cause).

¶ 30        Alternatively, the State argues that the seizure was supported by a reasonable suspicion of criminal activity. However, we need not decide whether the seizure was supported by a reasonable suspicion because, even if it was, the agents exceeded the scope of a *Terry* stop. Police conduct occurring during an otherwise lawful seizure does not render the seizure unlawful unless it either unreasonably prolongs the duration of the detention or independently triggers the fourth amendment. *People v. Harris*, 228 Ill. 2d 222, 237 (2008). In the present case, the agents' conduct independently triggered the fourth amendment as it essentially constituted an arrest in the absence of probable cause. In determining whether an arrest occurred, the court can consider many factors, including (1) the time, place, length, mood, and mode of the interrogation; (2) the number of police officers present; (3) any indicia of formal arrest or evidence of restraint; (4) the intention of the officers; (5) the extent of the officers' knowledge; (6) the focus of the officers' investigation; (7) the subjective belief of the detainee concerning his arrest status; (8) any statement or nonverbal conduct by the police indicating that the detainee was not free to leave; and (9) whether the detainee was told that he was free to leave or that he was under arrest. *People v. Reynolds*, 257 Ill. App. 3d 792, 799-800 (1994). Additionally, an arrest occurs when a person's freedom of movement is restrained by a show of authority or by means of physical force. *People v. Barlow*, 273 Ill. App. 3d 943, 949 (1995).

¶ 31        Here, after the defendant had landed and placed his airplane inside the hangar, a military helicopter landed nearby and agents exited, one in full tactical gear. Six or more air agents and ground agents approached the defendant with guns drawn and pointed at the defendant. The defendant was immediately frisked and handcuffed. Use of handcuffs is generally indicative of an arrest. *People v. Wells*, 403 Ill. App. 3d 849, 857 (2010). Accordingly, the defendant was restrained by physical force, when handcuffed, and by a show of authority, when surrounded by at least six agents with guns pointed at him. No reasonable person in the defendant's situation would have felt free to leave. Further, Shockney testified that the defendant was not free to leave during the document check or while they were waiting for the canine unit to arrive. Because the defendant was arrested in the absence of probable cause, the seizure was unlawful.

¶ 32        The State argues that the agents did not exceed the scope of a *Terry* stop, because cuffing the defendant and having weapons drawn at the outset of the encounter was necessary for their safety. The State notes that drug crimes are often associated with guns and violence. However, it is well established that, even when an officer has a reasonable suspicion that an individual is a drug dealer, a *Terry* search for weapons is not supported merely by the

officer's belief that drug dealers carry weapons. *People v. Rivera*, 272 Ill. App. 3d 502, 509 (1995). Rather, an officer must be able to point to specific, articulable facts that would warrant a reasonably prudent person in the circumstances to believe that his safety, or the safety of others, was in danger. *People v. Flowers*, 179 Ill. 2d 257, 264 (1997); see, *e.g.*, *United States v. Gonzalez*, No. 5:08CR250, 2008 WL 3980138, at *6 (N.D. Ohio Aug. 21, 2008) (display of weapons did not exceed scope of *Terry* stop because person waiting for plane had a history of drug trafficking convictions and carrying concealed weapons). In the present case, there were no surrounding circumstances giving rise to a justifiable fear for personal safety. When the defendant saw the helicopter landing, he did not attempt to flee or reach for any weapons. The agents had no knowledge that weapons were present or that the defendant had a history of using weapons. As such, the agents were not justified in using force to effectuate the defendant's seizure.

¶ 33   Moreover, the seizure of the defendant was unlawful because the agents' conduct unreasonably prolonged the duration of the detention. The record indicates that Fekete was notified at 3:30 p.m. that an aircraft suspected of drug activity was on its way to Du Page Airport. Hain testified that he was not notified about the possibility of a drug sniff until 4:30 p.m. and was not asked to go the airport until 5:23 p.m. Hain therefore did not arrive until after 6:05 p.m. Fekete testified that the defendant refused to consent to a search of the boxes at 5:25 p.m. and that the canine sniff occurred at 6:15 p.m. Under the circumstances in the present case, the canine unit could have been at the airport and available when the defendant's plane landed and taxied to the hangar. Instead, the detention was prolonged an additional 30 to 40 minutes to wait for the canine unit to arrive. Accordingly, the agents' conduct unreasonably prolonged the duration of the detention. *Cf. id.* (no unreasonable prolonging of detention where canine unit arrived on the scene simultaneously with the other officers).

¶ 34   Finally, the State argues that the trial court's determination that the defendant did not consent to Shockney's request to enter the plane to retrieve the airworthiness certificate was against the manifest weight of the evidence. This contention is without merit. First, the trial court did not make a factual finding as to whether the defendant did or did not give consent for Shockney to enter the aircraft to obtain the airworthiness certificate. The trial court found only that any consent given by the defendant to enter the hangar or seize items from the plane was the fruit of the illegal arrest and detention. This was not error.

¶ 35   Probable cause and a search warrant are not needed if an individual consents to a search. *People v. Vasquez*, 388 Ill. App. 3d 532, 551 (2009). A consent to search is valid if, based on the totality of the circumstances, it is voluntary. *Id.* However, once an illegal seizure has occurred, the fruits of any subsequent search are tainted by the initial illegality. *Id.* Nonetheless, if the State can establish attenuation between the illegal seizure and the subsequent consent to search, the consent will be considered purged of the primary taint and, therefore, valid. *Id.* at 552. Factors to consider in determining whether a consent to search was tainted by an illegal seizure include (1) the temporal proximity between the seizure and the consent; and (2) the presence of intervening circumstances. *Id.*

¶ 36   In the present case, the defendant was arrested in the absence of probable cause. Following a protective sweep for weapons, Shockney proceeded to conduct a document

check of the defendant and his plane. According to Shockney, after he checked the defendant's pilot's license and medical certificate, the defendant consented to Shockney boarding the plane to retrieve the airworthiness certificate. The record indicates that all this occurred in relatively quick succession. As such, the illegal seizure and any subsequent consent to search the plane were so inextricably connected in temporal proximity that the consent was not purged of the taint of the illegal seizure. Furthermore, there were no intervening circumstances attenuating the taint of the seizure. Accordingly, the trial court did not err in finding that any of the items seized from the plane through the defendant's alleged consent were the fruit of the illegal seizure. *Id.*

¶ 37                                    III. CONCLUSION

¶ 38      For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

¶ 39      Affirmed.