# Illinois Official Reports

## Appellate Court

---

### *People v. Gutierrez*, 2016 IL App (3d) 130619

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICARDO GUTIERREZ, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-13-0619 |
| Filed | December 7, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 07-CF-2219; the Hon. Carla Alessio-Policandriotes, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Kathleen T. Zellner and Nicholas N. Curran, of Kathleen T. Zellner & Associates, P.C., of Downers Grove, for appellant.<br><br>James Glasgow, State's Attorney, of Joliet (Thomas D. Arado, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE LYTTON delivered the judgment of the court, with opinion.<br>Justice McDade specially concurred, with opinion.<br>Justice Schmidt dissented, with opinion. |

**OPINION**

¶ 1 Defendant, Ricardo Gutierrez, appeals the denial of his motion to quash arrest and suppress evidence, arguing that he was arrested without probable cause when several police officers entered his residence in the early hours of the morning, woke him, handcuffed him, and did not tell him that he was free to leave. We reverse and remand with directions.

¶ 2 FACTS

¶ 3 Defendant was charged by indictment with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2006)) with codefendant Gabriela Escutia. The indictment alleged that defendant and Escutia shot Javier Barrios with a handgun, causing Barrios's death on October 28, 2007.

¶ 4 Defendant filed a motion to quash arrest and suppress evidence, arguing that he was arrested in his home at approximately 5:20 a.m. on October 29, 2007, without a warrant or without probable cause. The motion argued that statements made by defendant while in police custody following his arrest should be suppressed as the product of an unlawful arrest.

¶ 5 A hearing was held on defendant's motion. Officer Robert Plutz of the Plainfield police department testified for the State. Plutz testified that he assisted in the investigation into the death of Barrios who was shot in a parking lot near the Meijer gas station in Plainfield.

¶ 6 Once the officers identified Barrios as the victim, they "ran his information" and learned that Escutia had an order of protection against him. The officers then "ran the information" on Escutia and obtained a general description of her and her vehicle. Plutz obtained Escutia's address, which he believed was in Plainfield. Plutz requested that a patrol car drive by Escutia's residence to see if her vehicle was parked outside. An officer drove by Escutia's residence but did not observe her vehicle there.

¶ 7 Sergeant Troy Kivisto asked Plutz to make exigent circumstances requests on Barrios's and Escutia's cell phone numbers. Plutz requested cell phone records from Escutia's cell phone company. Plutz sent a fax to the phone company at approximately 11:25 p.m. on October 28 stating, "Per our phone conversation today, the reason we needed the phone records were [sic] to quickly follow up on any leads, identification on owners and persons of interest in our homicide case." Plutz testified that a person of interest could include a witness, someone with knowledge, or a suspect. Plutz sent a second fax to the phone company requesting Escutia's records, including incoming and outgoing calls, cellular tower pings, texts, and voicemails. Plutz also requested that the phone company "put a freeze on" Escutia's voicemails.

¶ 8 After Plutz requested the records, Kivisto informed him that they were going to Chicago to meet Secret Service agents who were going to help them locate Escutia's cell phone. Three Plainfield officers and several Kendall County officers met the Secret Service agents at the District 9 police station in Chicago. The Plainfield and Kendall County officers drove around with the Secret Service agents for two to three hours while the agents tried to locate Escutia's cell phone. Several Chicago officers joined them as well. The Secret Service agents learned that Escutia's alternative billing address was a residence in Chicago.

¶ 9 Plutz and approximately seven other officers arrived at the residence of the alternative billing address at approximately 5:20 a.m. The Chicago officers went up to the front door and

knocked. The Plainfield officers were behind the Chicago officers. A Chicago officer had a conversation in Spanish with the individual who answered the door. A female resident let the officers in. One of the Chicago officers spoke with the female resident and filled out a permission to search form with her.

¶ 10 Plutz was told by another officer that Escutia and defendant had come out of the back bedroom, where they had been sleeping when the officers arrived. Plutz spoke with defendant. Plutz introduced himself and asked if defendant would come to the police station to answer some questions. Defendant asked Plutz where he was from, and Plutz said he was from the Plainfield police department. Defendant then said, "yeah, sure." A Chicago police officer handed Plutz a cell phone and a 9-millimeter bullet that the officer found in a drawer in defendant's bedroom. Plutz put the items in his pocket.

¶ 11 Plutz testified that he believed the officers wanted to question defendant because he was found sleeping in a bed with Escutia, who was a person of interest. Plutz stated that the officers did not take defendant into custody because of the 9-millimeter bullet that was located in his room. Plutz testified that the first time he heard defendant's name was at the residence in Chicago. Plutz did not put defendant in handcuffs before he left nor did he physically restrain defendant in any way. Plutz did not see anyone else put defendant in handcuffs. Plutz was armed while in the residence, but he never removed his weapon from its holster. Plutz did not observe any other officers display their weapons or yell. Plutz testified that defendant was "absolutely" free to stay at the residence if he had chosen to do so.

¶ 12 When the officers left the residence, all the squad cars were full. The Chicago officers drove defendant to the Chicago police station where the Plainfield and Kendall County officers had parked their cars. Plutz was still in the residence when defendant got into the car with the Chicago officers. Plutz rode to the Chicago police station with several Kendall County officers. When Plutz got to the Chicago police station, defendant was not in handcuffs. Defendant got into the front passenger seat of Plutz's squad car, and Plutz drove to the Plainfield police station. Defendant was not in handcuffs while in Plutz's vehicle. Defendant did not make any statements regarding Barrios's death during the car ride. Plutz did not recall saying anything to defendant during the car ride that would have indicated that defendant was free to leave.

¶ 13 When they arrived at the Plainfield police department, defendant asked to use the restroom, which Plutz allowed him to do. Plutz then led defendant to a small interview room with chairs and a table. Plutz told defendant to knock on the door if he needed anything, and Plutz left the room. Plutz learned that Escutia, while she was in another officer's car being driven to Plainfield, had stated that she and defendant shot Barrios. At that point, Plutz did not believe that defendant was free to leave. Plutz eventually returned to the interview room with another detective. They led defendant to another small interview room for recording purposes. Shortly before 12 p.m. on October 29, the detectives went over defendant's *Miranda* rights. Defendant waived his *Miranda* rights and answered their questions. Defendant signed a written statement typed by Plutz after he had read the statement. The statement contained admissions regarding defendant's involvement in Barrios's murder. A videotape of defendant's communications with Plutz was entered into evidence.

¶ 14 Plutz testified that defendant was not arrested prior to making a statement at the Plainfield police department. Plutz stated that the officers had no reason to arrest defendant at the residence. Plutz acknowledged that he later stated in an affidavit attached to a complaint for a

search warrant that a Nokia cell phone was seized as evidence when defendant was arrested. Plutz testified that the statement in his affidavit was incorrect; Plutz put the Nokia cell phone in his pocket at the residence before defendant was arrested. Plutz stated someone from the State's Attorney's office drafted the affidavit, but Plutz signed it.

¶ 15        On November 8, 2007, Plutz sent a fax to Escutia's cell phone company stating, "The reason we needed phone records was to locate possible offenders in a homicide that might be a threat to other individuals." Plutz testified that someone from the cell phone company asked him to phrase it that way. Plutz stated that when he initially requested Escutia's cell phone records on October 28, 2007, he believed it was possible that Escutia was an offender.

¶ 16        Detective Carianne Siegel of the Plainfield police department testified that she was assigned on October 28, 2007, to investigate the death of Barrios. Siegel and other officers learned that Escutia had an active order of protection against Barrios. Siegel testified that another Plainfield officer sent an "exigent circumstances request" regarding Escutia's cell phone number to Escutia's cell phone company, requesting "subscriber information" about Escutia, including her billing address.

¶ 17        Siegel contacted a Secret Service agent because the Secret Service has the ability to ping cell phones. Siegel told the Secret Service agent about the events leading up to the homicide, what happened at the scene, and that they were trying to locate Escutia's cell phone. Siegel, two other Plainfield officers, and several Kendall County officers went to the Chicago police station to meet the Secret Service agents. Three Chicago officers joined as well. The officers drove around Chicago for approximately one hour trying to locate the ping from Escutia's cell phone. Eventually, a representative from Escutia's cell phone company gave a Secret Service agent an alternate billing address for Escutia at a residence in Chicago.

¶ 18        At approximately 5:20 a.m., all the officers drove to the alternate billing address to look for Escutia. Siegel did not know whose residence it was. Three Chicago police officers, three Plainfield police officers, four Kendall County officers, and approximately four members of the Secret Service went to the residence. The three Chicago officers were in uniform, but the others were in plain clothes. While the Secret Service agents stayed outside, Siegel thought that the other 10 officers may have all entered the residence.

¶ 19        One of the officers knocked on the front door, and four people from inside the residence came to the door, including the homeowner and three young men. The individuals who answered the door were cooperative with the police. The residence was crowded when the officers entered; Siegel believed that there were approximately 16 people in the residence including the officers and residents. Neither the police nor the individuals inside the residence yelled or screamed during the encounter. No police officer drew a weapon inside the residence at any point. One of the members of the household consented to a search of the residence.

¶ 20        One of the residents told the officers that Escutia and defendant were sleeping in the residence. The officers located defendant and Escutia in a back bedroom. An officer asked Escutia if she would come to the Plainfield police department to speak with the officers, and Escutia said yes. Siegel left the residence with Escutia and Kivisto. The three of them rode in a car to the Plainfield police department. Before they arrived, Escutia told the officers that she and defendant shot Barrios.

¶ 21        Siegel believed defendant left the residence with the Chicago officers and was initially taken to the Chicago police station. Siegel did not overhear any Plainfield officers tell any Chicago officers that defendant was free to leave if he chose to do so. Siegel did not know

whether the Chicago officers handcuffed defendant because she did not see them transport him. Siegel testified that, at the time the officers arrived at the residence, defendant was not a suspect in the murder of Barrios. Siegel stated that the officers had not developed probable cause to believe defendant was responsible for the crime.

¶ 22　　A few days after the officers encountered defendant and Escutia at the residence, Siegel obtained a court order for the information they received from Escutia's cell phone company pursuant to the exigent circumstances request. In her application for the order, Siegel stated under oath: "At that point, officers made an exigent circumstances request with T-Mobile for above cellular phone information, which led to the arrest of Gabriela Escutia and [defendant]. Both suspects later confessed to the murder that is the subject of said homicide investigation." Siegel testified at the hearing that neither Escutia nor defendant were under arrest at the time they confessed to the murder.

¶ 23　　Sergeant Kivisto of the Plainfield police department testified that he was involved in the investigation of Barrios's death on October 28, 2007. Kivisto and other officers investigating the case learned that Escutia had an order of protection against Barrios, and they wanted to speak to Escutia regarding Barrios's death. The officers sent an exigent circumstances request to Escutia's cell phone company to obtain her subscriber information. They did not have a court order at that time. The officers attempted to locate Escutia using the subscriber information they obtained from her cell phone company, but she was not at her residence.

¶ 24　　Kivisto, the other Plainfield officers investigating the case, and officers from the Kendall County major crimes task force went to the Chicago police station to meet Secret Service agents to discuss tracing Escutia's cell phone. The Secret Service agents received information that Escutia's cell phone may have been pinging in the City of Chicago. Sometime after 12 a.m. on October 29 the Plainfield officers, Kendall County officers, and Secret Service agents drove around Chicago trying to locate Escutia's cell phone. Three Chicago officers were with them as well. At approximately 5 a.m., the Secret Service agents were informed by Escutia's cell phone company that Escutia had an alternative billing address in Chicago. The officers then went to the residence at the alternative billing address at approximately 5:20 a.m.

¶ 25　　Kivisto testified that three Plainfield officers, several Kendall County officers, three Chicago officers, and approximately three Secret Service agents went to the residence. The officers identified a black Nissan vehicle parked outside the residence as being registered to Escutia. Only the Chicago officers were in uniform. The Chicago officers may have had marked police vehicles, but the other officers were in unmarked squad cars. When the officers arrived at the residence, they did not turn on their sirens or police lights. Two officers went to the back of the residence, where there was a door, due to officer safety concerns and so they could make contact with anyone exiting the residence to determine if Escutia was inside.

¶ 26　　The remaining officers went to the front door and knocked. Two of defendant's brothers initially opened the door. The officers identified themselves and asked to enter the residence. They were permitted to enter and went inside. Kivisto believed that approximately six officers entered the residence. Kivisto spoke with defendant's mother, Maria Garcia. One of the Chicago officers acted as a translator for Kivisto, as Maria only spoke Spanish. Kivisto told Maria they wanted to speak with Escutia. Maria told the officers that Escutia and defendant were sleeping in the back bedroom, and she led three officers to the back bedroom.

¶ 27　　The officers knocked on the door and announced their presence. Escutia and defendant opened the door. The officers identified themselves and said they wanted to speak with

Escutia. Kivisto asked Escutia to come to the Plainfield police department to speak with the officers regarding an incident that happened in Plainfield earlier that night. Escutia said she would come.

¶ 28    Escutia got dressed and left the residence with Kivisto and Siegel in Kivisto's squad car. The officers did not place Escutia in handcuffs. The officers drove Escutia to the Plainfield police department. Escutia began talking approximately 10 minutes into the car ride. She eventually told the officers that she shot Barrios. At that point, Escutia was no longer free to leave. Kivisto testified that prior to confessing to the murder, Escutia would have been free to leave if she had chosen to.

¶ 29    Kivisto never drew his weapon at the residence, but stated that his weapon may have been visible. Kivisto did not see any other officers draw their weapons. Kivisto testified that none of the officers raised their voices or told any of the occupants of the residence to go to any particular location.

¶ 30    Kivisto testified that he was at the residence to speak to Escutia, but after they arrived, the officers decided they also wanted to interview defendant. The Chicago officers transported defendant to the Chicago police station because the Plainfield and Kendall County officers did not have enough cars on the scene to transport defendant directly to Plainfield. Kivisto did not see the manner in which the Chicago officers transported defendant.

¶ 31    Officer Hermogenes Del Toro testified that he worked for the Chicago police department. On October 29, Del Toro and two other Chicago police officers were given instructions to join Kendall County task force officers at the Chicago police station. The Chicago officers were asked to ride with the task force as an assist unit. Del Toro believed he and the other Chicago officers were wearing plain clothes and riding in an unmarked vehicle.

¶ 32    The officers went to a residence with the task force. When asked what he knew at the time he arrived at the residence, Del Toro testified: "[T]hey told us they were doing a follow-up on a homicide in the suburbs. That's about it." Before arriving at the residence, Del Toro was told that the officers wanted to talk to defendant. Del Toro did not recall hearing Escutia's name before they arrived at the residence. When the officers arrived at the residence, someone knocked on the front door. The "mother of the house" came to the door and indicated that she did not speak English but spoke Spanish. Del Toro believed he was the only officer who spoke Spanish, so he talked to the mother in Spanish. Del Toro asked her if defendant was home, and she indicated that he was in the back bedroom sleeping. She then let the officers in. When they entered the residence, some officers went to the back and brought defendant and a woman to the front of the residence with them.

¶ 33    An officer asked Del Toro to translate a consent to search form for the mother. Del Toro orally translated the form, and the mother signed it. Del Toro then went to the back bedroom to assist the other Chicago officers in searching it. Del Toro recovered a 9-millimeter bullet and a cell phone from a drawer in the back bedroom. Del Toro gave the items to a member of the task force.

¶ 34    Del Toro testified that the task force officers asked the Chicago officers to transport defendant back to the Chicago police station because they did not have enough room in their vehicles. The Chicago officers handcuffed defendant for officer safety and placed defendant in the backseat of their car. Del Toro testified that defendant was not given a choice as to whether he would be handcuffed. Del Toro did not speak to defendant and did not hear any other officer speak to defendant before he was placed in the car. If defendant had requested to go back to the

residence while the Chicago officers were driving him to the Chicago police station, the Chicago officers would have contacted the task force to see what they wanted to do. Del Toro would not have let defendant go unless the task force indicated he could do so. Del Toro estimated that it took approximately five to seven minutes to drive from the residence to the Chicago police station.

¶ 35     When the Chicago officers arrived at the police station, they turned defendant over to the task force. Del Toro could not recall whether defendant was still handcuffed when they turned him over to the task force. Del Toro stated that he did not prepare a report of the incident afterward. Prior to testifying, Del Toro received a packet of reports from an assistant State's Attorney which caused Del Toro to remember "the name of the accused" and the "items recovered." After Del Toro testified, the prosecutor stated that the State would not be calling any additional witnesses.

¶ 36     Manuel Garcia testified for the defense. On October 29, Manuel lived in an apartment with his mother, Maria Garcia, and his brothers, Daniel Gutierrez, Gabriel Renteria, and defendant. Manuel testified that Escutia was also there on October 29. At 5 a.m., Manuel was asleep on a sofa bed with Daniel. Manuel heard a knock at the front door that woke him up. Manuel heard walkie-talkie radios and told Daniel to open the door because he thought it was the police. Daniel opened the door, and a plain clothes officer with his gun drawn told Daniel to put his hands up. The officer patted Daniel down and walked into the apartment. Manuel did not hear the officer ask for permission. Eight or nine officers dressed in plain clothes entered after the first officer. The other officers were holding their weapons at their sides. An officer asked Manuel who was in the residence, and Manuel responded his mom and his brothers were there. The officer then asked Manuel who owned a black car, and Manuel replied that no one owned a black car.

¶ 37     The officers then went to Maria's bedroom. Maria came into the front room and showed the officers where Gabriel's room was. The officers then retrieved Gabriel from his room. The officers then went to defendant's room and defendant and Escutia came out. The officers brought Escutia into the room where Manuel was standing. Escutia was wearing her pajamas and no shoes. Manuel saw defendant with four officers. Defendant was handcuffed and wearing his pajamas.

¶ 38     The officers removed Escutia and defendant from the residence. Two officers spoke with Maria in English and Spanish. Del Toro told Maria, in Spanish, to sign a paper. Manuel told Maria not to sign it because she did not know what she was signing. Manuel testified that no one explained to Maria in Spanish what she was signing. Another officer told Del Toro that if Maria did not sign the paper "they were going to turn the fucking house inside out." Del Toro repeated in Spanish what the other officer said. Maria then signed the paper. Manuel stated that Maria looked "scared and confused."

¶ 39     Gabriel testified that on October 29, he lived with his mother, Maria, and his brothers, Daniel, Manuel, and defendant, in an apartment in Chicago. At 5 a.m., Gabriel was sleeping in his bedroom. Gabriel heard someone come into his bedroom heard loud voices saying, "[G]et up, put your hands up, keep 'em up." Gabriel opened his eyes and saw flashlights and approximately four plain clothes officers pointing their weapons at him. An officer asked Gabriel if he was the owner of the black Nissan, and Gabriel said no. The officers then brought Gabriel out to the kitchen area outside his bedroom.

¶ 40    The lead officer asked Gabriel where his brother was, and Gabriel said his brother "should be in his bedroom." Gabriel described where his brother's bedroom was located. Approximately four or five officers approached defendant's bedroom and entered without knocking. The officers were holding their flashlights and weapons. The first two officers held their weapons out in front of their bodies and the others held their weapons at their sides. The officers loudly told defendant and Escutia to get up and put their hands up. Escutia walked out of the bedroom wearing shorts, a T-shirt, and shoes. Escutia was escorted by officers to the front room.

¶ 41    Defendant was then brought out of his bedroom by approximately four officers. The officers were not holding their weapons. Defendant was wearing a T-shirt and shorts and was handcuffed. Some officers talked to defendant in the kitchen while other officers searched defendant's bedroom. The officers brought several items out of defendant's bedroom, including plastic bags and approximately four bullets. The officers told defendant, "Come on, you're taking a ride, let's go, we have to talk." Defendant then left the residence. Defendant remained handcuffed from the time he walked out of his bedroom until the time he left the residence.

¶ 42    Maria Garcia testified that at approximately 5 a.m. on October 29, she was sleeping in her bedroom. Law enforcement officers came to her residence brandishing weapons and ordered her to come out of her room. When Maria came out of her bedroom, there were approximately six to eight officers in the living room. The officers asked Maria to sign a consent to search form. Initially, Maria did not want to sign the form. Then her "son said sign it, because [the officer] said in bad words that he was going to mess up the house." On cross-examination, Maria testified that defendant was on parole on October 29.

¶ 43    Escutia testified that at approximately 5 a.m. on October 29, she and defendant were sleeping in defendant's bedroom when she was woken up by the sound of walkie-talkie radios. She opened her eyes and saw a flashlight shining in her face and a police officer holding a gun. The officer said, "[P]ut your hands up." The officer then asked what their names were, and defendant and Escutia told him their names. The officers asked whether Escutia and defendant were dressed. Escutia said she was dressed; she was wearing a tank top and sweatpants. There were approximately four officers in the room at that time. Most of them were in plain clothes, but one Chicago police officer was wearing a uniform. An officer escorted Escutia to the front of the residence. An officer told Escutia that he needed her to come down to the police station and answer some questions. Escutia said she would go, but she testified she did not feel she had a choice to decline. Escutia testified she did not feel free to leave. Escutia left the residence with the officers. The defense rested.

¶ 44    The State called Victor Markowski as a rebuttal witness. Markowski testified that in October 2007, he was a Master Sergeant with the Illinois State Police. He was a member of the Kendall County major crimes task force. Markowski became involved in the investigation into the death of Barrios on October 28. Markowski went to a residence in Chicago with other members of the task force, Plainfield police officers, and Chicago police officers. When Markowski entered the home, he saw defendant and Escutia. A search of the residence was conducted at some point after Markowski entered. Markowski gave Kivisto a Kendall County major crimes task force consent to search form, which was presented to an "older female subject" seated at the kitchen table. Markowski did not see any police officer draw a weapon inside the residence.

¶ 45    Markowski testified that he learned defendant was on parole during a discussion at the Plainfield police department before the officers left Plainfield to go to Chicago. Markowski testified that the meeting at the Plainfield police department was led by Kivisto and Detective Sergeant Zimmerman from the task force. Markowski could not remember who gave him the information. The meeting occurred between 10 p.m. on October 28 and 2 a.m. on October 29. Markowski testified that it was his recollection that the officers had two named subjects prior to going to Chicago. Markowski believed that Escutia was identified as a person of interest because she had an order of protection against Barrios, and defendant was somehow identified through that information. Markowski did not know how defendant had been identified.

¶ 46    The State introduced documentation from the Illinois Department of Juvenile Justice regarding defendant's parole.

¶ 47    The defense recalled Siegel, Kivisto, and Plutz. They all testified that they did not recall defendant or his parole status being discussed by the officers at the Plainfield police department before they left for Chicago. Siegel testified that she did not have any knowledge of defendant's name prior to leaving for Chicago. Siegel and Plutz testified that they were not present for the entire meeting, but Kivisto believed he was present for the entire meeting unless he left briefly to use the restroom or take a phone call. The defense rested.

¶ 48    The trial court issued a written order denying defendant's motion to quash arrest and suppress evidence. The trial court found that the testimony of the occupants of the Chicago residence was not credible. The trial court also found:

> "That various officers were assigned certain duties and had various responsibilities but that not all officers knew what another knew at any given time of the investigation; but that any known information of one officer in the investigation may be relied upon to support the actions of another officer; including the names of [defendant and Escutia] and that defendant *** was on parole."

¶ 49    The trial court further found:

> "That law enforcement entry into the residence and its presence to remain and ultimately its search was without any show of force, no yelling, no removal of weapons from its holsters, without complaint or resistance by any of the occupants, without physical restraint."

¶ 50    The trial court also found that defendant's "interaction with law enforcement was without show of force sufficient to characterize it anything but concentual [*sic*]." The trial court found that defendant agreed to leave the residence but was not under arrest or in custody. The trial court also found that defendant was on parole when the officers arrived at his residence and a 9-millimeter bullet was found in the room he was sleeping in. The trial court found that the Chicago officers handcuffed defendant during the 10-minute drive to the Chicago police station without direction from any other officer "solely because of the policy of the Chicago police that they handcuff any unknown individual who is transported in their vehicle." The trial court found "there [was] no evidence that the presence alone of the police at [Maria's] residence had any adverse affect on [defendant's] decision to agree to accompany the police particularly because he did not have contact with the majority of the officers." The trial court concluded that defendant "was not under arrest at the time he accompanied [the] police to the station to assist in [their] investigation." Alternatively, the trial court found that the officers had probable cause to arrest defendant because he was on parole and occupying a room that

contained ammunition.

¶ 52                                                         I

¶ 53         On appeal, defendant argues that the trial court erred in denying his motion to quash arrest and suppress evidence. We apply a two-part standard of review when reviewing a ruling on a motion to quash arrest and suppress evidence. *People v. Hopkins*, 235 Ill. 2d 453, 471 (2009). "While we accord great deference to the trial court's factual findings, and will reverse those findings only if they are against the manifest weight of the evidence, we review *de novo* the court's ultimate ruling on a motion to suppress involving probable cause." *People v. Jackson*, 232 Ill. 2d 246, 274 (2009).

¶ 54         An arrest without probable cause or a warrant violates the fourth amendment of the United States Constitution. U.S. Const., amend. IV; *People v. Melock*, 149 Ill. 2d 423, 436 (1992). For fourth amendment purposes, a "seizure" is synonymous with an "arrest." *Melock*, 149 Ill. 2d at 436. "A person has been arrested when his freedom of movement has been restrained by means of physical force or a show of authority." *Id.* (citing *United States v. Mendenhall*, 446 U.S. 544, 553 (1980)). In determining whether an arrest has occurred, we consider whether " 'the circumstances are such that a reasonable person, innocent of any crime, would conclude that he was not free to leave.' " *People v. Lopez*, 229 Ill. 2d 322, 346 (2008) (quoting *In re D.G.*, 144 Ill. 2d 404, 409 (1991)).

¶ 55         In *Mendenhall*, the United States Supreme Court articulated four factors that may be indicative of a seizure, including: (1) "the threatening presence of several officers"; (2) "the display of a weapon by an officer"; (3) "some physical touching of the person of the citizen"; and (4) "the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554; see also *People v. Murray*, 137 Ill. 2d 382, 390-91 (1990), *abrogated on other grounds by People v. Luedemann*, 222 Ill. 2d 530 (2006). The *Mendenhall* factors "are not exhaustive and that a seizure can be found on the basis of other coercive police behavior that is similar to the *Mendenhall* factors." *Luedemann*, 222 Ill. 2d at 557.

¶ 56         Additionally, Illinois courts have considered the following factors in determining whether a defendant was under arrest:

> "(1) the time, place, length, mood, and mode of the encounter between the defendant and the police; (2) the number of police officers present; (3) any indicia of formal arrest or restraint, such as the use of handcuffs or drawing of guns; (4) the intention of the officers; (5) the subjective belief or understanding of the defendant; (6) whether the defendant was told he could refuse to accompany the police; (7) whether the defendant was transported in a police car; (8) whether the defendant was told he was free to leave; (9) whether the defendant was told he was under arrest; and (10) the language used by officers." *People v. Washington*, 363 Ill. App. 3d 13, 24 (2006).

¶ 57         In this case, defendant was arrested at his residence prior to leaving for the Chicago police station. First, a significant number of police officers entered the residence. See *Mendenhall*, 446 U.S. at 554 (holding that "the threatening presence of several officers" is a factor indicative of a seizure). The testimony of the State's witnesses established that approximately

6 to 10 armed police officers entered defendant's residence. Detective Siegel testified that the residence was crowded when the police officers entered.

¶ 58    Second, as to the time, place, and mood of defendant's encounter with the police, the officers entered defendant's residence shortly after 5 a.m., after being let in by other occupants. The officers knocked on defendant's bedroom door and woke him up. The early hour of the encounter and the fact that it occurred in the privacy of defendant's residence while he was sleeping render it particularly intrusive. See *United States v. Jerez*, 108 F.3d 684, 690 (7th Cir. 1997) ("Because our law and legal traditions long have recognized the special vulnerability of those awakened in the night by a police intrusion at their dwelling place, our Fourth Amendment jurisprudence counsels that, when a knock at the door comes in the dead of night, the nature and effect of the intrusion into the privacy of the dwelling place must be examined with the greatest of caution.").

¶ 59    Third, there was no evidence at the hearing that defendant was ever told that he could refuse to accompany the police officers or that he was free to leave. Officer Plutz proceeded to ask defendant to come to the police station to answer some questions, and defendant said, "yeah, sure." Defendant was transported in the back of a police car.

¶ 60    Fourth, the officers' use of handcuffs when defendant was transported to the Chicago police station is particularly significant. While not dispositive, "[u]se of handcuffs is *generally indicative of an arrest*." (Emphasis added.) *People v. Marcella*, 2013 IL App (2d) 120585, ¶ 31. Though there was some evidence that defendant was handcuffed for officer safety, Officer Del Toro testified he did not believe that he or the other officers told defendant he was free to leave. In fact, Del Toro testified that the Chicago officers would not have released defendant during the drive to the Chicago police station unless they obtained permission from the task force officers. While the ride to the Chicago police station may have lasted only a few minutes and defendant's handcuffs were removed before he was driven to Plainfield, we find that a reasonably innocent person in defendant's position would not have felt free to leave at that point in light of the prior use of handcuffs and the other circumstances discussed above.

¶ 61    We expressly reject the cases cited by the State in support of the proposition that the "mere fact" that defendant was handcuffed did not mean he was under arrest. The cases cited by the State all involve situations where police officers used handcuffs on individuals who had been detained by the police, either pursuant to a *Terry* stop or during the execution of a search warrant. See *People v. Colyar*, 2013 IL 111835, ¶ 46 ("[H]andcuffing does not automatically transform a *Terry* stop into an illegal arrest."); *People v. Nitz*, 371 Ill. App. 3d 747, 754 (2009) (*Terry* stop); *United States v. Smith*, 3 F.3d 1088, 1095 (7th Cir. 1993) (investigative detention); *United States v. Esieke*, 940 F.2d 29, 36 (2d Cir. 1991) (investigative detention); *United States v. Kapperman*, 764 F.2d 786, 790 n.4 (11th Cir. 1985) (investigative detention); *Muehler v. Mena*, 544 U.S. 93 (2005) (use of handcuffs on individual lawfully detained incident to execution of a search warrant was permissible under the circumstances).

¶ 62    Here, defendant was not lawfully detained by the officers, either pursuant to an investigative detention or incident to the execution of a search warrant. Rather, the State contends that the handcuffing of defendant occurred during a consensual encounter between defendant and the police during which defendant was not detained. None of the State's cases support the use of handcuffs in such a situation. We further note that even in cases involving an investigative detention for which officers had reasonable suspicion, the use of handcuffs is permissible only "in the 'rare' case wherein common sense and ordinary human experience

convince us that an officer believed reasonably that an investigative stop could be effectuated safely only through the use of handcuffs." *Smith*, 3 F.3d at 1094; *United States v. Glenna*, 878 F.2d 967, 972 (7th Cir. 1989).

¶ 63 We find that a reasonable innocent person in defendant's position would not have felt free to leave. The facts indicate that the defendant was under arrest: (1) the encounter occurred at defendant's residence in the early hours of the morning; (2) the police awoke defendant from his sleep in his bedroom; (3) the number of police officers at the residence; (4) the officers searched defendant's bedroom; (5) defendant was not told he was free to leave; and (6) defendant was handcuffed when transported in a police car to the Chicago police station. See *Melock*, 149 Ill. 2d at 437 ("The relevant inquiry in determining whether a suspect has been arrested is whether, under the circumstances, a reasonable person would conclude that he was not free to leave."). While none of the foregoing facts standing alone would establish that defendant was under arrest, the cumulative effect of these facts is that a reasonable innocent person in defendant's position would not have felt free to leave. See *Washington*, 363 Ill. App. 3d at 24 ("No factor is dispositive and courts consider all of the circumstances surrounding the detention in each case.").

¶ 64 Contrary to the dissent's statements (see *infra* ¶¶ 86, 95), we agree with the trial court's findings of fact in reaching our conclusion that a reasonable person would not have felt free to leave. The court rightly found that multiple police officers went to defendant's residence at approximately 5:20 a.m., residents other than defendant gave the officers permission to enter and search the residence, defendant said yes when an officer asked him to accompany the officers to the Plainfield police department, and defendant was handcuffed by Chicago officers for the drive to the Chicago police station. However, for the reasons discussed above, we reject the trial court's legal conclusions that defendant's "interaction with law enforcement was without show of force sufficient to characterize it anything but concentual [*sic*]" and that defendant was not under arrest when he left the residence.

¶ 65 We note that the trial court found "there [was] no evidence that the presence alone of the police at [Maria's] residence had any adverse affect on [defendant's] decision to agree to accompany the police particularly because he did not have contact with the majority of the officers." We agree that the presence *alone* of multiple police officers at the residence did not establish that defendant was under arrest. See *Washington*, 363 Ill. App. 3d at 24. However, when the presence of the officers is weighed together with the other facts indicative of arrest, a reasonable innocent person in defendant's position would not have believed he was free to leave.

¶ 66 The State does not dispute that the officers lacked probable cause to arrest defendant for his involvement in the death of Barrios at the time he was handcuffed and placed in the Chicago officers' police car. Our review of the record confirms that the officers lacked probable cause to arrest defendant at that time. "Probable cause to arrest exists where the facts and circumstances known to the police officer at the time of the arrest are sufficient to warrant a person of reasonable caution to believe that an offense had been committed and that the offense was committed by the person arrested." *People v. Sims*, 192 Ill. 2d 592, 614 (2000). Plutz, Kivisto, and Siegel testified that they went to defendant's residence in the early morning hours of October 29 because they were looking for Escutia. All three testified that they did not discuss defendant prior to leaving for Chicago. Plutz testified that the first time he heard defendant's name was at the residence in Chicago. Plutz believed the officers wanted to talk to

defendant because he was found sleeping with Escutia. Kivisto testified that the officers decided at the Chicago residence that they wanted to talk to defendant as well as Escutia. Plutz testified that the officers had no reason to arrest defendant at the residence. Similarly, Siegel testified that when the officers arrived at the residence, defendant was not a suspect and the officers had no probable cause to arrest him. Thus, we find that the arrest was improper.

¶ 67    The trial court found that the officers had probable cause to arrest defendant because he was on parole and was occupying a room that contained ammunition. A police officer need not subjectively rely on the correct offense for an arrest to be valid and the officer's subjective reliance on the wrong offense "does not foreclose the State from later justifying the arrest by proving probable cause on another basis." *People v. Mourecek*, 208 Ill. App. 3d 87, 94 (1991). But see *People v. James*, 255 Ill. App. 3d 516, 524-25 (1993) ("However, the law is clear that a court, judging the propriety of an arrest after the fact, cannot validate an unconstitutional arrest on the theory that probable cause existed for another offense which was not contemplated by the police at the time of the arrest.").

¶ 68    In order to sustain defendant's arrest on the basis that he was on parole and was found occupying a room containing ammunition we would have to find that the officers knew defendant was on parole at the time of his arrest. See *Sims*, 192 Ill. 2d at 614 ("Probable cause to arrest exists where the facts and circumstances *known to the police officer at the time of the arrest* are sufficient to warrant a person of reasonable caution to believe that an offense had been committed and that the offense was committed by the person arrested." (Emphasis added.)). The trial court's factual finding that the officers knew defendant was on parole before they arrived at the residence was not supported by the record and was against the manifest weight of the evidence. See *People v. Harris*, 2015 IL App (1st) 133892, ¶ 20.

¶ 69    Here, the trial court's factual finding was based on Markowski's testimony that he learned at a meeting at the Plainfield police department prior to leaving for Chicago that defendant was on parole. Markowski stated that he could not remember who told him about defendant's parole status and he did not know exactly how defendant was identified before the officers left for Chicago. Plutz, Kivisto, and Siegel, on the other hand, gave detailed testimony establishing that the officers did not know defendant's name, much less his parole status, before leaving for Chicago. Plutz, Kivisto, and Siegel all testified that they identified Escutia as a person of interest after learning that she had an order of protection against Barrios. They located the Chicago residence by obtaining an alternate billing address from Escutia's cell phone company. Siegel testified that when the officers arrived at the residence, she did not know whose residence it was. Plutz stated that the first time he heard defendant's name was at the residence, and he believed the officers wanted to interview defendant because he was found sleeping in a bed with Escutia. Plutz, Kivisto, and Siegel testified that there was no discussion of defendant or his parole status at the Plainfield police department prior to leaving for Chicago. Given the detailed testimony given by Plutz, Siegel, and Kivisto, Markowski's conflicting, uncertain, and vague testimony that defendant had been identified at all, much less as a parolee, was not well grounded.

¶ 70    Although Del Toro testified that he recalled hearing defendant's name, he testified that: "[T]hey told us they were doing a follow-up on a homicide in the suburbs. That's about it." Del Toro also testified that he did not recall defendant's name prior to reading police reports sent to him by the prosecutor. It was Plutz, Siegel, and Kivisto, however, who investigated Barrios's death and filed their reports on their encounters with Escutia and defendant.

¶ 71    Accordingly, we find that the evidence at the hearing on the motion to quash arrest and suppress evidence did not establish that the officers had identified defendant or learned of his parole status prior to leaving for Chicago. Defendant's arrest cannot be upheld based on that the officers had probable cause to believe that defendant was occupying a room containing ammunition while on parole.

¶ 72                                                II

¶ 73    However, our finding that defendant was arrested without probable cause does not end the suppression inquiry. Rather, the statements made by defendant subsequent to his illegal arrest may be admissible at trial "if they were obtained 'by means sufficiently distinguishable to be purged of the taint of the illegal arrest.' " *Washington*, 363 Ill. App. 3d at 26 (quoting *People v. Barlow*, 273 Ill. App. 3d 943, 952 (1995)). When determining whether a confession was sufficiently attenuated from the unlawful arrest, courts consider the following factors: "(1) the proximity in time between the arrest and the confession; (2) the presence of intervening circumstances; (3) the purpose and flagrancy of the police misconduct; and (4) whether the defendant received *Miranda* warnings." *Id.*

¶ 74    Because the trial court found that defendant was lawfully arrested at the residence, it did not reach the attenuation issue. Though defendant argues that we may reach the issue on appeal, citing *People v. Elliot*, 314 Ill. App. 3d 187, 193 (2000), in light of the particular facts of this case, we believe it is appropriate for the trial court to make factual findings as to this issue allowing for a more complete record to be developed.

¶ 75    Therefore, we remand this cause to the trial court to determine whether sufficient attenuation exists to purge the taint of defendant's illegal arrest from defendant's subsequent statements and for any factual findings necessary to such a determination. See *People v. Bates*, 218 Ill. App. 3d 288, 298 (1991). On remand the trial court may hold any further evidentiary hearings as necessary. If sufficient attenuation is found to exist, the trial court is directed to reinstate the judgment of conviction. See *id.* If the trial court does not find that sufficient attenuation exists, it should suppress the statements and conduct further proceedings consistent with this order. See *id.*

¶ 76    Defendant also argues that the trial court refused to allow him to call Escutia as a witness and refused to admit the order of protection Escutia filed against Barrios. In light of our above holding, we need not address this issue.

¶ 77                                          CONCLUSION

¶ 78    The judgment of the circuit court of Will County denying defendant's motion to quash arrest is reversed. We remand this matter to the circuit court to determine whether sufficient attenuation exists to purge defendant's subsequent statements from the taint of the illegal arrest and further proceedings in accordance with this opinion.

¶ 79    Reversed and remanded with directions.

¶ 80    JUSTICE McDADE, specially concurring.

¶ 81    I believe the trial court's denial of defendant's motion to quash arrest and suppress evidence was improper. The record clearly establishes that defendant was placed under *arrest*

at his residence prior to leaving for the Chicago police station. The record also clearly establishes that the *arrest* was made without probable cause. Accordingly, I concur in Justice Lytton's opinion reversing defendant's conviction and remanding the matter for further findings on attenuation.

¶ 82 I write separately to explain that my concurrence is for the sole procedural purpose of creating a majority opinion. While Justice Lytton does not reach this issue, I believe the record also clearly establishes that the statements made by defendant, subsequent to his illegal arrest, were *not* sufficiently attenuated from the unlawful arrest. Taking such a position, however, would leave us without a majority opinion: (1) Justice Lytton would remand for an attenuation hearing; (2) I would reach the question of attenuation here on appeal, answer it in the negative, and remand the matter for the limited purpose of allowing the State to decide whether to retry defendant without the illegally obtained statements; and (3) Justice Schmidt would affirm outright. Therefore, to avoid such a non-decision, I join Justice Lytton's position.

¶ 83 Finally, I would be remiss if I did not call attention to the fact that the sole basis for the actions of the police that night, according to the clear and certain testimony of Plutz, Siegel and Kivisto, was that Escutia was "a person of interest" because she had an order of protection against the decedent, Javier Barrios. The reasonable inferences to be drawn from the existence of this order are that (1) Escutia believed herself to be in danger from Barrios and sought protection against him through the court, and (2) the court agreed Barrios posed a threat to her and entered an order for her protection. If, hypothetically, Escutia had been the murder victim here, the existence of the order of protection might provide some basis for suspecting Barrios and finding him to be a person of interest.

¶ 84 The converse is, however, not true. The mere existence of an order protecting Escutia from Barrios simply cannot justify: (1) the warrantless "exigent circumstances requests" (whatever they are) for the records of cell phone companies; (2) the enlistment of Secret Service agents to drive around the streets of Chicago in a search for cell phone "pings"; (3) the warrantless invasion of a private home at 5 a.m. by 6 to 10 law enforcement agents from 4 law enforcement agencies, some or all of whom were armed; or (4) the illegal arrest of defendant—who the police were not even aware existed and who, to their knowledge, at the time they took him into custody, had done nothing other than share a bed with Escutia in that private home. The police conduct is, literally, unwarranted and legally unjustified such that any "fruit" derived from it should be barred.

¶ 85 This *is* still America, where federal and state constitutional principles inform and direct law enforcement activities. We do not live in a police state where law enforcement agents can descend *en masse* in the wee hours of the morning to awaken private citizens in their homes and take two people into custody—all without benefit of either a warrant, demonstrable exigent circumstances, or probable cause.

¶ 86 JUSTICE SCHMIDT, dissenting.

¶ 87 The trial court did not err in denying defendant's motion to quash arrest and suppress evidence. After an evidentiary hearing, the trial court found defendant was not under arrest when he agreed to accompany officers to a police station. *Supra* ¶ 50. The foundation for the trial court's legal conclusion was the factual determinations that, under the circumstances, the following were *not* indicative of arrest: (1) the number of officers in the residence; (2) the time, place, and mood of defendant's encounter with the officers; (3) that defendant was never

explicitly told he was free to be uncooperative with the officers; and (4) that defendant was briefly handcuffed during a segment of transport after he voluntarily agreed to accompany officers. Alternatively, police had probable cause to arrest defendant for violating the terms of his parole. *Supra* ¶ 50.

¶ 88 We must give deference to factual issues resolved by the trial court. *People v. Almond*, 2015 IL 113817, ¶ 55; see also *Ornelas v. United States*, 517 U.S. 690, 699 (1996) (noting that "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers"). Instead, the majority resolves the factual issues in this case in direct contradiction to the trial court's findings (*supra* ¶¶ 57-60) concluding that, in its opinion, "a reasonable innocent person in defendant's position would not have felt free to leave." *Supra* ¶ 63. A reasonable innocent person in defendant's position would have felt free to decline the officer's request.

¶ 89 Police are free to ask citizens for their cooperation in a variety of settings, so long as they do not communicate that compliance is required. See generally, *Florida v. Bostick*, 501 U.S. 429, 435 (1991). There is no evidence that the police were coercive or implied defendant's presence at the police station was mandatory. In spite of this, the majority finds that the police violated the fourth amendment, illegally seizing defendant when he accepted their request to assist them in a murder investigation. The majority reaches the opposite conclusion of the trial court by inserting its own interpretation of the facts into its analysis.

¶ 90 There is no established threshold for the number of officers on scene that creates an arrest. See *Almond*, 2015 IL 113817, ¶¶ 57-58. The mere presence of officers cannot invalidate someone's consent. See *People v. Leon*, 311 Ill. App. 3d 624, 633 (2000) (citing two cases from this court (*People v. Spriegel*, 233 Ill. App. 3d 490, 494 (1992), and *People v. Denwiddie*, 50 Ill. App. 3d 184, 191 (1977)), noting that "the presence of several armed, uniformed officers, in and of itself, does not give rise to such intimidation as to override a person's free will or render [them] incapable of giving valid consent to search"). Both determinations are based on the totality of the circumstances. *Almond*, 2015 IL 113817, ¶ 57.

¶ 91 The majority concludes that because "6 to 10 armed police officers entered defendant's residence" and it was "crowded," he was under arrest. *Supra* ¶ 57. Putting aside the fact that all police officers are generally armed while on duty, the presence of 6 to 10 officers in a house with at least 5 other unknown subjects does not, *per se*, create a threatening or coercive presence. At most, this created a 2 to 1 ratio between police and citizens. In this instance, there were at least five unknown subjects in the residence while officers were conducting a consent search. Under the circumstances, the presence of 6 to 10 officers—dispersed throughout the residence, not all in one room with the defendant—is entirely reasonable. Police were investigating a homicide, not an ordinance violation.

¶ 92 Contrary to the majority's implicit assertion, there is no *per se* rule that a defendant is under arrest when awakened in bed to speak with the police. *Supra* ¶ 58. While this factor can weigh in favor of an arrest, it should also be viewed in light of the totality of the circumstances. See *Jerez*, 108 F.3d at 690. Here, the officers were working diligently to solve a murder that happened less than 12 hours earlier. The officers did not intentionally wait until dawn and abruptly enter defendant's residence in order to gain a tactical advantage. Rather, the record supports the notion that they arrived at defendant's residence as soon as practically possible in the course of their investigation. According to the trial court, the encounter was amicable. By

ignoring the trial court's factual findings—namely, that the officers knocked on doors and engaged in voluntary discussions with the occupants—the majority creates an immunity shield for criminal defendants during sleeping hours. The majority characterizes police as an arm of the state purposely lying in wait to pounce upon prey at a vulnerable moment. *Supra* ¶ 58; *supra* ¶ 85 (McDade, J., specially concurring).

¶ 93       Police officers need not always inform citizens they are free to leave during encounters outside the context of arrests and *Terry* stops (*Terry v. Ohio*, 392 U.S. 1 (1968)). The Supreme Court has explicitly rejected such notions in the context of obtaining consent to search. *United States v. Drayton*, 536 U.S. 194, 206 (2002) (citing *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996), and *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). The majority ignores this. *Supra* ¶¶ 12, 21, 59, 60. Again, the fact that police did not explain this legal nuance to the defendant can weigh in favor of an arrest, but it is not a bright line rule. See *Drayton*, 536 U.S. at 206-07 (citing *Schneckloth*, 412 U.S. at 227). The trial court did not deem the warning necessary under the circumstances, and this court should not make it a *de facto* requirement.

¶ 94       Further, the fact that someone is in handcuffs does not mean they are *ipso facto* under arrest. *Supra* ¶ 60 (quoting *Marcella*, 2013 IL App (2d) 120585, ¶ 31). Several Chicago police officers accompanied investigating Plainfield officers to the Chicago residence. Plainfield officers intended to transport only one person, Escutia, back to Plainfield for questioning. As such, a logistical hurdle emerged when they learned defendant had been with Escutia all night and he, too, was willing to go to Plainfield for questioning. Unbeknownst to the Plainfield officers and after defendant agreed to go to Plainfield, a Chicago police officer handcuffed the defendant—strictly for safety purposes—during transport for approximately five miles in a cageless squad car. This act safely and efficiently resolved a significant dilemma without violating the defendant's rights. After transport, the Chicago officer removed the handcuffs. The defendant proceeded to voluntarily walk down the sidewalk and then sat in the front seat of a squad car, unhandcuffed, for the length of time it takes to drive from Chicago's District 9 headquarters to the Plainfield police department, a distance of approximately 35 miles. These circumstances do not render the brief use of handcuffs an arrest.

¶ 95       A salient feature of the majority opinion is that it punishes law enforcement for doing excellent investigative work. Assuming, *arguendo*, there was a fourth amendment violation in this case, it was incidental and the exclusionary rule should not be triggered. The exclusionary rule exists to deter police misconduct that is purposeful or flagrant and should be applied by courts as a "last resort" not the "first impulse." (Internal quotation marks omitted.) *Utah v. Strieff*, 579 U.S. ___, ___, 136 S. Ct. 2056, 2061 (2016). Instead, the majority has run astray of the exclusionary rule's purpose by engaging in a hyper-technical analysis in order to exclude reliable, condemning evidence.

¶ 96       Here, there was no purposeful or flagrant misconduct by the police. Their actions were in good faith and nothing about them shocks the conscience. The exclusionary rule "simply cannot be applied to a situation where it offers little or no deterrent benefit and where there is not the least bit of culpability that can be charged to the officer's conduct." *People v. LeFlore*, 2015 IL 116799, ¶ 51. Such is the case here.

¶ 97       The trial court's findings are supported by the record and the manifest weight of the evidence. Given the factual determinations of the trial court and the prevailing case law, this court should not reach a contrary legal conclusion. The trial court's factual findings cannot be ignored in our *de novo* review of its legal conclusion. The majority should be wary of

- 17 -

substituting its judgment for that of the trial court. See *People v. Alexander*, 239 Ill. 2d 205, 213-15 (2010) (noting in the context of sentencing that this court cannot substitute its judgment for that of the trial court merely because it would have weighed factors differently).

¶ 98    Moreover, the majority's emphasis on law enforcement's use of Escutia's phone records in locating defendant is misplaced. *Supra* ¶¶ 7-8, 15-17, 22-24; *supra* ¶ 84 (McDade, J., specially concurring). Defendant cannot vicariously assert an alleged violation of anyone else's constitutional rights. *People v. McCarty*, 223 Ill. 2d 109, 155 (2006); *Plumhoff v. Rickard*, 572 U.S. ___, ___, 134 S. Ct. 2012, 2022 (2014).

¶ 99    Assuming, for the sake of argument, that defendant was seized when he voluntarily left his residence, the police had probable cause to arrest him for violating the terms of his parole. The trial court found that officers had probable cause to arrest the defendant before he voluntarily left his residence with the police. *Supra* ¶ 50. Officer Markowski's knowledge that defendant was on parole imputes that information to all of the other officers involved. *People v. Wallace*, 2015 IL App (3d) 130489, ¶ 38; *People v. Ortiz*, 355 Ill. App. 3d 1056, 1065 (2005).

¶ 100   The majority concludes that Markowski's testimony regarding his knowledge of the defendant's status as a parolee was "vague" and unsupported and, therefore, "not well grounded." *Supra* ¶ 69. In so doing, the majority finds that the investigating officers were unaware of defendant's parole status prior to leaving his residence and the trial court, therefore, erred in finding probable cause to arrest defendant at that time. *Supra* ¶ 71. Once again, the majority does not give due deference to the trial court's factual findings as required. *Ornelas*, 517 U.S. at 699. The majority clearly makes a credibility finding with regard to Markowski's testimony contrary to that made by the trial court. Unless its conclusion is unreasonable, the trier of fact, not the appellate court, makes credibility determinations. *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). We should affirm. The record does not support a finding that police illegally seized defendant. Rather, it shows very effective police work involving cooperation between law enforcement agencies.

¶ 101   I must also comment on Justice McDade's special concurrence. The fact that my colleague is unable to connect the dots between Escutia and the victim (*supra* ¶¶ 83-84), as were the police, does not render the police action unconstitutional. Neither the fourth amendment, nor any other amendment prohibits police use of logic and commonsense. I would affirm and, therefore, dissent.